UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARREN BRACEY,

                              Petitioner,

                -against-

HAROLD R. GRAHAM,

                              Respondent.

16cv7919 (VSB) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

Proceeding *pro se*, Petitioner Darren Bracey ("Petitioner") seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenging his conviction by a jury of two counts of burglary in

the first degree, in violation of Sections 140.30(1) and 140.30(4) of the New York Penal Law;

two counts of robbery in the first degree, in violation of Sections 160.15(2) and 160.15(4) of the

New York Penal Law; one count of robbery in the second degree, in violation of Section

160.10(1) of the New York Penal Law; two counts of criminal possession of a weapon in the

second degree, in violation of Sections 265.03(1)(b) and 265.03(3) of the New York Penal Law;

one count of criminal possession of a controlled substance in the third degree, in violation of

Section 220.16(1) of the New York Penal Law; and one count of criminal possession of a

controlled substance in the fourth degree, in violation of Section 220.09(1) of the New York

Penal Law.  For these crimes, Petitioner was sentenced, as a persistent violent felony offender, to

concurrent prison terms of 20 years to life on each of the burglary, robbery, and weapon

possession counts, and to concurrent prison terms of 10 and six years, respectively, on the two

narcotics counts.  Petitioner is currently incarcerated at Coxsackie Correctional Facility, in

Coxsackie, New York.[1]

In his habeas petition, Petitioner raises two claims.  First, Petitioner claims that he was

allegedly denied the effective assistance of trial counsel, in violation of the Sixth Amendment,

because his attorney failed to investigate the psychiatric condition of the victim of the robbery,

failed to consult or call on an expert witness at trial, and failed to introduce the victim's medical

records into evidence at trial.  Second, Petitioner claims that his written statement to the police

after his arrest should have been suppressed because it was allegedly taken in violation of his

Fifth Amendment right against self-incrimination.  (*See generally* Pet.)  In opposition,

Respondent Harold R. Graham ("Respondent"), Superintendent of Auburn Correctional Facility,

argues that Petitioner's ineffective-assistance-of-counsel claim is meritless, and that his

suppression claim is unexhausted, procedurally barred, and, in any event, without merit.  (*See*

*generally* Respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas

Corpus, dated Mar. 27, 2017 ("Resp. Mem.") (Dkt. 14).)

For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## BACKGROUND

### A.    Factual Background

The facts summarized herein are taken from the evidence presented at Petitioner's trial,

which commenced on December 3, 2009, before the Honorable Michael Sonberg, J.S.C., in the

---

[1] At the time of filing his habeas petition, Petitioner was incarcerated at Auburn Correctional Facility in Auburn, New York.  (*See* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, docketed Oct. 7, 2016 ("Petition" or "Pet.") (Dkt. 2).)  The Federal Bureau of Prisons Inmate Locator (available at https://www.bop.gov/inmateloc/index.jsp) indicates that Petitioner has since been moved to Coxsackie Correctional Facility.

New York Supreme Court, New York County.[2]  Petitioner was tried by a jury on 11 charges:

three counts of burglary in the first degree, three counts of robbery in the first degree, robbery in

the second degree, two counts of criminal possession of a weapon in the second degree, criminal

possession of a controlled substance in the third degree, and criminal possession of a controlled

substance in the fourth degree.  (*See* Dkt. 16-1, at SR 6-10 (Indictment); *see generally* Trial Tr.)

       The prosecution presented testimony from Ernest Merritt ("Merritt") (the victim of the

robbery), as well as from several officers with the New York City Police Department ("NYPD"),

a 911 operator, a chemist, and a NYPD lab technician.  (*See generally* Trial Tr.)  Petitioner did

not take the stand to testify on his own behalf, although his trial counsel called one witness to

testify – an NYPD detective, who had conducted a brief interview of Merritt.  (*See* Trial Tr.

(Dkt. 16-31), at 573-76.)

---

[2]  The transcripts of the state court proceedings in this case have been submitted by Respondent in sections, running continuously from Dkt. 16-20 through 16-32.  The transcript of a pretrial suppression hearing, conducted before the Honorable James A. Yates, J.S.C., for four days over the period from August 19 to September 16, 2008 ("Supp. Hrg. Tr.) starts at Dkt. 16-20, at "ECF 2" (referring to the page number affixed to the document when it was uploaded to the Court's Electronic Case Filing ("ECF") system).  The transcript containing counsel's oral argument on Petitioner's suppression motion and Justice Yates's oral ruling on that motion, which occurred on September 16, 2008 ("Supp. Ruling Tr."), then starts at Dkt. 16-23, at ECF 74.  After a delay of over a year, a second judge, the Honorable Charles Solomon, J.S.C., conducted a hearing on November 18 and 23, 2009, on the issue of whether the earlier suppression hearing before Justice Yates was accurately transcribed by the court reporter; that hearing transcript starts at Dkt. 16-23, at ECF 100.  Ultimately, Petitioner's trial was conducted by a third judge – the Honorable Michael Sonberg, J.S.C. – and the transcript of pretrial proceedings conducted before him on November 23, 2009, when the case was first transferred to him ("Pretrial Tr."), starts at Dkt. 16-24, at ECF 67.  The transcript of the jury *voir dire*, conducted from November 30 through December 2, 2009, starts at Dkt. 16-24, at ECF 132.  The transcript of Petitioner's trial, conducted from December 3 through December 14, 2009 ("Trial Tr."), starts at Dkt. 16-27, at ECF 81.  The transcript of Petitioner's sentencing by Justice Sonberg on March 23, 2010 ("Sentencing Tr."), starts at Dkt. 16-32, at ECF 111.  Each transcript has consecutive page numbering, and, when referencing these transcripts herein, this Court will cite to the Docket entry where the relevant pages can be found, and then to the pages on the transcripts themselves, rather than to the ECF numbering.

1.     **The Robbery**

Petitioner's convictions arose from a robbery of Merritt that occurred on November 26, 2007 at the Yale Hotel (the "Hotel"), a six-floor, single-room occupancy building on West 97th Street in Manhattan.   (*See id.* (Dkt. 16-28), at 48-49.)   At trial, Merritt testified that, at the time of the robbery, he was 61 years old and was working as the managing agent of the Hotel.   (*See id.*, at 49-50.)   He testified that, on November 25, 2007, he had started working in his office on the first floor at 8:00 a.m. and had finished his roughly 16-hour shift sometime after midnight on November 26.   (*See id.,* at 50-51, 73, 81.)   Merritt recalled that, once his shift ended, he went up to the second floor of the Hotel to use the bathroom and then to go to his one-bedroom apartment, which was also located on the second floor.   (*See id.*, at 81-82.)   According to Merritt, when he got to his apartment, he spoke with his wife,[3] who was in bed, but, at some point after 3:00 a.m., he walked to the communal kitchen across the hall to boil water in a kettle to make coffee, and then returned to his apartment.   (*See id.*, at 82-83.)   Merritt testified that, when he opened his apartment door again to check on the kettle, a man later identified as Mombasa McDaniel ("McDaniel"), whom Merritt described as a "heavyset short, stout black man" came "rushing out [of] the [bathroom] door with a gun pointed at [Merritt's] face."   (*Id.*, at 84; *see also id.* (Dkt. 16-30), at 477.)   Merritt testified that right behind McDaniel were two individuals, a woman later identified as Domonique Allen ("Allen") and a "tall skinny" man – claimed by the prosecution to have been Petitioner – who both "came out of the bathroom."   (*Id.* (Dkt. 16-28), at 85, 94; *see id.* (Dkt. 16-30), at 34; *id.* (Dkt. 16-29), at 305.)   Merritt described Allen as an "overdressed" "short individual" who wore an "airforce cap" and kept her back towards him (*id.*,

---

[3]   Merritt's wife did not testify due to a medical condition, and the trial court provided a missing witness charge at the close of evidence.   (*See* Trial Tr. (Dkt. 16-32), at 679-80.)

at 92), and stated that the man who was with Allen kept his "face [] buried inside the hood" of his "dark" sweatshirt (*id.*, at 94-95, 114).

In recounting what happened next, Merritt testified that McDaniel pushed him back into his apartment, while Allen and the other man followed McDaniel inside.  (*See id.*, at 90.)  Once inside the apartment, Merritt "tussled" with McDaniel, trying to get the gun away from him, as Allen stood facing the door and the other man stood next to Merritt's wife, who remained in bed. (*Id.*)  Merritt testified that, at one point during this physical altercation, he fell to the floor on top of McDaniel and held the gun pressed against McDaniel's chest.  (*See id.*, at 112.)  Merritt recounted that, after McDaniel promised that "nothing [was] going to happen to [Merritt] or his wife," Merritt began to release him.  (*Id.*)  It was at that moment, Merritt recalled, that the second man "pointed [a] gun at [him]."  (*Id.*, at 113.)  According to Merritt, McDaniel then demanded that he turn over the money that, according to a rumor at the Hotel, he kept in a "shoe box."  (*Id.*, at 116-17, 119, 136.)  Merritt testified that neither Allen nor the second man spoke when they were in his apartment (*see id.*, at 116), but that the second man helped McDaniel rummage through the dresser drawers and boxes in Merritt's closet (*id.*, at 117).  Merritt testified that he saw McDaniel take various items of jewelry, his wallet, and $57.00.  (*See id.*, at 119-20.)  At that point, Merritt recalled, Allen said that she heard "someone" outside and the three individuals "tried to rush out" of his apartment.  (*Id.*, at 121.)

### 2.     The 911 Call

During the robbery, one of Merritt's second-floor neighbors, "Al," called 911 and informed the operator that police officers should come quickly to the Hotel because men "with

guns" were in Merritt's room robbing him.  (Dkt. 16-12, at SR 240.)[4]  On the call, Al stated that

two individuals, whom he described as black men wearing hoodies, had entered Merritt's room.

(*See id.*, at SR 240-41.)  Al specified that one hoodie was burgundy and one was black.  (*Id.*, at

SR 241.)  When asked by the operator whether the men were "heavy set or [were] skinny," Al

stated that "the one [he] saw," who had "brown skin," was "slim."  (*Id.*, at SR 242.)  Al also said

that he heard Merritt yell "I'll give you what you want, don't do nothing, I'll give you what you

want," and then the two men "push[ed]" Merritt into his apartment.  (*Id.*)  Staying on the line and

remaining in his locked apartment, Al informed the operator by the end of the call that the police

had arrived.  (*See id.*)

### 3.    **The Arrests**

Several officers were notified about the robbery and arrived at the scene.  NYPD Officer

Robert Pastalove testified at trial that he and his partner NYPD Officer Steven Landon had been

on their normal overnight shift, from 11:15 p.m. on November 25, 2007 to 7:50 a.m. on

November 26, 2007.  (*See* Trial Tr. (Dkt. 16-29), at 297-98.)  Officer Pastalove testified that at

approximately 3:45 to 3:50 a.m. on November 26, he received a radio communication directing

him to 316 West 97th Street, which he knew to be the Hotel, and he and Officer Landon

proceeded to that location.  (*See id.*, at 299.)  According to Officer Pastalove, upon their arrival,

he saw two other officers, NYPD Officer Mark Myskowsky and NYPD Officer Brian Leyden,

who were outside of the Hotel.  (*See id.*, at 302.)  Officer Pastalove testified that the four officers

"entered the [Hotel] through the front door" and proceeded "to the back . . . where the staircase

---

[4] During the trial, the audio recording of the 911 call was admitted into evidence as an
excited utterance and a present sense impression.  (*See* Pretrial Tr. (Dkt. 16-24), at 29.)
Although a transcript of the 911 call was not admitted into evidence, it was attached to a post-
trial motion that Petitioner filed pursuant to Section 440.10 of the New York State Criminal
Procedure Law.  (*See* Background, *infra*, at Section B(4); *see also* Dkt. 16-12, at SR 240-43.)

[was] located." (*Id.*)  Officer Pastalove recounted that, once the four officers reached the second

floor, Officers Myskowsky and Leyden proceeded down the first hallway on the left, while he

and Officer Landon remained in the landing area to block a possible "escape route" and watch

the hallway doors. (*Id.*, at 303.)

Regarding what happened next, Officer Pastalove testified that he saw one of the doors in

"hallway A" creak open a few inches, and through that gap, saw a "hand holding a gun." (*Id.*)

Officer Pastalove, who was approximately eight feet away from the door, yelled for the

individual to "drop the gun." (*Id.*, at 304.)  According to Officer Pastalove, at that moment, the

door opened by "about [12] inches" and he saw the individual's face. (*Id.*)  At this point during

his trial testimony, Officer Pastalove identified Petitioner as the individual he saw holding the

gun. (*See id.*, at 305.)  Officer Pastalove went on to testify that, after he yelled again to "drop the

gun," Petitioner placed the gun on the floor, but then "slammed the door closed." (*Id.*)  In

response, Officer Pastalove "ran towards the door, kicked it open," and "saw [Petitioner] trying

to escape down the hallway." (*Id.*)  Officer Pastalove was able to run toward Petitioner,

apprehend him, and handcuff him. (*See id.*)  According to Officer Pastalove, when he frisked

Petitioner, he initially "removed . . . a wad of cash" from Petitioner's "front pocket" but then put

it back (*id.*, at 317); he also "felt [a] bag of crack" but "did not pull it out of [Petitioner's]

pocket" (*id.*, at 335).  Officer Pastalove testified that his partner, Officer Landon, recovered the

loaded gun that Petitioner had placed in the hallway. (*See id.*, at 309.)

With respect to the other arrests that were made, Officer Myskowsky testified at trial that,

when he and his partner proceeded down the second-floor hallway, he confronted McDaniel (*see*

*id.* (Dkt. 16-30), at 476), who dropped the wallet and ran in the opposition direction (*see id.*, at

476, 480).  Officer Myskowsky picked up the wallet, chased McDaniel, and apprehended him in

the hallway.  (*See id.*, at 477.)  Officer Myskowsky testified that, as he approached McDaniel, he heard Merritt "yell[] down the hall" that McDaniel "had robbed him."  (*Id.*)  Officer Myskowsky testified that he physically searched McDaniel for a gun, but did not find one, although he recovered items of jewelry and $37.00 from McDaniel's pockets.  (*See id.*, at 476-77.)  Officer Myskowsky testified that Merritt later identified the recovered wallet and jewelry as his own. (*See id.*, at 485-87.)

Officer Myskowsky also testified on cross-examination that, after Merritt identified McDaniel, both he (Officer Myskowsky) and Merritt turned in the hallway to see Petitioner, who was approximately "[15] to [20] feet away."  (*Id.* (Dkt. 16-31), at 515-16.)  According to Officer Myskowsky, Petitioner, who was already "in custody," was wearing a "very large . . . brown sweatshirt" and "brown boots."  (*Id.*, at 517, 519.)  When defense counsel asked Officer Myskowsky whether "Merritt [said to him] anything about [Petitioner], for instance, he robbed me" as they both stood in the hallway, Officer Myskowsky replied: "Not at that time, no."  (*Id.*, at 516.)  At trial, Merritt largely affirmed this, stating that, although he saw the police detain the "tall guy" (*id.* (Dkt. 16-29), at 247), he did not identify Petitioner to the police then because, when Petitioner left the apartment, the police were "already outside in the hallway," and they "apprehended [Petitioner] right there on the spot" (*id.*, at 277).

Lastly, NYPD Officer Benjamin White testified at trial that, when he and his partner NYPD Officer Christopher Condon arrived to the Hotel, they proceeded to the second floor and then to the "first hallway on the left," which was where they "encountered" Allen, who was walking in their direction.  (*Id.* (Dkt. 16-30), at 341.)  Officer White immediately apprehended Allen, who was wearing a "dark-colored jacket."  (*Id.*, at 344, 357.)  During his testimony, Officer White described witnessing NYPD Officer Brian Ring's physical search of Petitioner

after he was apprehended.  (*See id.*, at 346.)  Officer White testified that "Officer Ring produced

a quantity of crack cocaine from [Petitioner's] pocket."  (*Id.*, at 346-47.)

### 4.      Petitioner's Post-Arrest Statements

After the arrests, Officers Pastalove and Landon transported Petitioner to the 24th

Precinct.  From there, Officer Myskowsky brought Petitioner to an interview room and left him

with NYPD Sergeant Jonathan Salomons, who was a "white shield investigator" training to

become a detective.  (*See id.*, at 411.)  According to Sergeant Salomons, in the interview room,

he first identified himself and explained where they were, what the pending charges against

Petitioner were, and what his (Sergeant Salomons') role was in the investigation.  (*See id.*, at

413.)  Sergeant Salomons recalled that he then asked Petitioner certain preliminary questions to

ascertain his identity, including his name, address, and date of birth.  (*See id.*, at 414.)  After

asking those questions, Sergeant Salomons "explain[ed]" to Petitioner that the interview the

police were "about to conduct [would] take[] place in two parts."  (*Id.*)  According to Sergeant

Salomons, he specifically told Petitioner the following:

> . . . The first part of the interview is we ask everyone who comes
> upstairs to the interview room about issues that have nothing to do
> with the case that has brought them here at this moment and that is
> to gather intelligence about crimes that are occurring across the
> city.
>
> So, I asked [Petitioner] if he knew where I could purchase
> firearms –

(*Id.*)  At this point in Sergeant Salomons' trial testimony, the prosecutor stopped him and stated that she did not want him to "talk about" that "first" part of his "conversation" with Petitioner. (*Id.*)[5]

Instead, the prosecution asked Sergeant Salomons to describe the "second part of that conversation." (*Id.*)  Sergeant Salomons testified that he read Petitioner his *Miranda* rights"[6] off of a "pre-printed form[]" taken from a folder outside of the interview room and then explained to Petitioner that he would now be asked "questions about this specific case." (*Id.*, at 414-15.) According to Sergeant Salomons, Petitioner indicated that he understood his *Miranda* rights, signed the form, confirming that he had been advised of those rights, and then gave an oral account of his involvement in the incident.  (*See id.*, at 416-18, 420-23.)

At trial, Sergeant Salomons described Petitioner's oral account as follows:  Petitioner had visited the Hotel "to collect some money that was owed to him." (*Id.*, at 420.)  When no one was at an upstairs apartment, he travelled to the second floor to see Merritt, "who was going to give him [the] money." (*Id.*)  Petitioner reportedly knocked on Merritt's door and "was told to [wait 20] minutes" by "whoever was inside." (*Id.*)  While Petitioner waited in the second-floor hallway, he "bump[ed] into a girl that he [knew]," but whose name he did not provide.  (*Id.*, at 420-21.)  Petitioner said that he and the girl "decided to roll a blunt together while they [were] waiting." (*Id.*, at 421.)  Petitioner then went to Merritt's door, which was apparently open, and Merritt informed him that he did not have the money, "but that he ha[d] [20] bags of crack that

_____

[5]  As set out below (*see* Background, *infra*, at Section (B)(1)(a)), Sergeant Salomons testified at an earlier suppression hearing as to what he had asked Petitioner during the first part of the interview at the precinct (which he conducted prior to giving *Miranda* warnings), and about the statements that Petitioner gave in response to that initial questioning, but the prosecution did not introduce Petitioner's pre-*Miranda* statements at trial.

[6]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[Petitioner] could sell to make that money[,] which would be the equivalent of the money that was owed to him." (*Id.*)  Petitioner "left the room" and returned to the hallway, but, upon "hear[ing] a commotion in that room," went back to the apartment where he found "an argument going on between Merritt and a short fat guy." (*Id.*)  Merritt told Petitioner that he "owe[d] the guy money[,] but [did not] have any money to give him." (*Id.*, at 422.)  According to Petitioner, "[t]he argument [got] heated," and he "[hear[d] someone from outside the room yelling either the word police or [that] the police [were] coming." (*Id.*)  At that point, Petitioner left the apartment and went "to exit the building." (*Id.*)  When he left the apartment, though, he "heard something drop in the [A side] hallway" (referring to a gun) and "[h]e went to pick it up." (*Id.*)  "As he [was] heading toward the exit of the building[,] the police stop[ped]  him and [told] him to drop the gun," and he "put the gun down." (*Id.*)

At trial, Sergeant Salomons testified that he wrote down Petitioner's statement as it was given. (*See id.*, at 424.)  Sergeant Salomons also testified that he read the written statement back to Petitioner, and Petitioner confirmed its accuracy and signed it. (*See id.*, at 424-25.)  The written statement was admitted into evidence at trial, and a copy is contained in the State Court Record. (*See* Dkt. 16-1, at SR 17[7] (Statement).)  The statement reads as follows:

> I went to 316 West 97th Street to get paid for work I performed for
> Merritt in apartment 42B.  When I got there I went to 42E and we
> smoked a blunt.  I went to 22B to speak to Merritt and get paid.  He
> told me I have to wait twenty minutes.  I saw Domonique and we
> went to smoke a blunt.  I went to 22B to get paid and he did not
> have the money but he gave me drugs to sell, twenty bags.  I
> walked down the hallway to the elevator.  I heard Merritt arguing

---

[7] Apart from the submitted transcripts, the State Court Record in this case – including the parties' submissions made in connection with Petitioner's direct appeal and other post-conviction proceedings – has been submitted at Dkts. 16-1 through 16-19, and bears consecutively stamped page numbers, marked in the form "SR __."  This Court will refer to those page numbers when citing to materials contained in this portion of the record.

> with a fat guy.  I went back to the room and I went inside.  Merritt,
> fat guy and Domonique are all in the room 22B.  Fat guy and
> Merritt are arguing over money.  Merritt is telling me that he owes
> the fat guy money but doesn't have the money.  The argument got
> heated.  I left with the girl.  Other people in the hallway are yelling
> police.  I started running to leave the building.  I heard something
> drop and picked it up and walked to the A side door and the police
> stopped me right there and told me to drop the gun and I did.  I
> never went to rob anybody.  The gun was not mine.

(*Id.*)

### 5.     Merritt's Letters to the District Attorney's Office

After the robbery, Merritt wrote a series of letters to the New York County District

Attorney's Office.[8]  In a letter dated December 7, 2007, Merritt claimed that certain staff

members at the Hotel had "engineer[ed]" the robbery, and the "principal culprit" was "the very

same staff member" responsible for dealing drugs at the Hotel.  (Dkt. 16-11, at SR 214.)  Merritt

named four individuals who he believed were dealing drugs and enclosed a copy of Petitioner's

ID card from the Hotel.  (*See id.*, at SR 215.)  In the following months, Merritt sent additional

letters to the District Attorney's Office, outlining his various theories of the crime that had

occurred.  (*See, e.g.*, *id.*, at SR 216-18.)  In a May 27, 2008 letter that he entitled "Stipulation,"

Merritt requested that certain staff members and tenants be given a polygraph test to address

whether (1) he was the subject of a conspiracy between the Hotel, the Department of Homeless

Services, and the City of New York Department of Housing; and (2) there had been a conspiracy

to murder him in 2007 or 2008.  (*See* Dkt. 16-12, at SR 219-21.)

---

[8]  Although the letters were not admitted into evidence at trial, Merritt confirmed, in
cross-examination, that he sent the letters to the District Attorney's Office and answered several
questions regarding their contents.  (*See* Trial Tr. (Dkt. 16-29), at 215-31.)  Petitioner's trial
counsel also discussed the letters in his opening statement and summation.  (*See id.* (Dkt. 16-28),
at 34-35; *see also id.* (Dkt. 16-32), at 675.)

B.     **Procedural History**

1.     **Pretrial Proceedings**

In light of Petitioner's habeas claims, this Court summarizes below those portions of the

pretrial proceedings that relate to (a) Petitioner's pretrial motion to suppress, and (b) the efforts

that Petitioner's trial counsel, Robert Jaffe, Esq. ("Jaffe"), made to discover and introduce

evidence regarding Merritt's mental health and its potential effect on his credibility at trial.

a.     **The Suppression Hearing**

On August 19, 2008, a pretrial "*Mapp/Dunaway/Huntley/Wade*" hearing[9] was held before

the Honorable James A. Yates, J.S.C., in the Supreme Court of New York, New York County

(*see* Supp. Hrg. Tr. (Dkt. 16-20), at 2), on motions filed by Petitioner and his then co-defendant

Allen,[10] to suppress certain evidence, including Merritt's informal identification of Petitioner at

the precinct and Petitioner's post-arrest statement to Sergeant Salomons.

First, and as relevant here, Officer Myskowsky testified at the hearing that, a few hours

after the incident on November 26, 2007, he spoke with Merritt at the precinct to gather

additional details about the robbery.  (*See id.*, at 111-13.)  During that conversation, Merritt (who

---

[9] This hearing was held pursuant to:  (1) *Mapp v. Ohio*, 367 U.S. 643 (1961), to determine whether physical evidence sought to be used against Petitioner was obtained illegally; (2) *Dunaway v. New York*, 442 U.S. 200 (1979), to determine whether there was probable cause for Petitioner's arrest; (3) *People v. Huntley*, 15 N.Y.2d 72 (1965), to determine whether any statements made by Petitioner should be suppressed; and (4) *United States v. Wade*, 388 U.S. 218(1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures.

[10] Prior to the suppression hearing, McDaniel pleaded guilty to attempted first-degree robbery and received a determinate sentence of three-and-one-half years, plus two-and-one-half years of post-release supervision.  Following the hearing, Allen pleaded guilty to attempted first-degree burglary and received a determinate sentence of four years, plus five years of post-release supervision.

apparently saw Petitioner in a holding cell) told Officer Myskowsky that Petitioner "was one of the people [who] robbed him."  (*Id.*, at 109, 113-14.)

Next, Sergeant Salomons testified at the hearing (*see id.* (Dkt. 16-22), at 380), and described the two "parts" of his post-arrest interview with Petitioner.  He testified on cross-examination that, with respect to the first part of the interview – which was conducted before the *Miranda* warnings – he told Petitioner that he was going to ask him questions that were "totally unrelated to [his] case," and that the reason for those questions was to see if the police could "gather intelligence regarding criminal activity in the City of New York."  (*Id.*, at 405.)  As to those initial questions, Sergeant Salomons testified as follows:

> I asked him do you know where I can buy a gun.  He said not you, because he was referring to the way I look, which would be understandable.  Then he said you know yeah, I mean there are places out there to buy guns, but he could not give me a specific address . . .
>
> . . .
>
> I asked him do you know where I can buy drugs.  He said yeah, you can buy drugs at 316 West 97th which is where he was arrested from, which we already know.  I said is there anything else you can tell me about criminal activity in the City of New York.  He said no.  I said okay, that part is over.  Now we will talk to you about what happened to you last night.

(*Id.*, at 406.)  At that point, according to Sergeant Salomons, he told Petitioner that he needed to read him his *Miranda* rights before asking him any further questions.  (*See id*.)

Based on the testimony at the hearing, Petitioner's trial counsel argued, *inter alia*, that (1) Merritt's statement to Officer Myskowsky at the precinct identifying Petitioner in the holding cell should be suppressed because the circumstances of the identification were unduly suggestive (*see id.* (Dkt. 16-23), at 430-32); and (2) "once [Sergeant Salomons] start[ed] questioning

[Petitioner] without [*Miranda*] warnings," then "anything" that Petitioner said to him "after that" should be suppressed as well (*id.*, at 442).

On November 6, 2008, Justice Yates made oral findings of fact and conclusions of law on the record.  (*See* Supp. Ruling Tr. (Dkt. 16-23), at 15.)  As relevant here, the court first determined that Merritt's "identification" of Petitioner at the precinct was "unduly impermissibly suggestive" and granted Petitioner's motion to suppress that identification.  (*Id.*, at 22-23.)[11]

Second, the court noted that Petitioner's post-arrest interview with Sergeant Salomons "was troubling," because, "when a person is arrested with a gun, it's not just a robbery that he is being interviewed about, he is also being interviewed about the gun charge that he is facing." (*Id.*, at 23-24.)  The court therefore reasoned that, while having Petitioner in custody, and before administering *Miranda* warnings, it was "improper" for the police to have asked him "what he kn[ew] about guns."  (*Id.*, at 24.)  "On the other hand," the court found "there was no statement" that Petitioner made prior to the *Miranda* warnings that "would have led to the later statement that [he gave] after the *Miranda* warnings."  (*Id.*)  In particular, the court noted that Petitioner initially "denied any involvement with guns."  (*Id.*)  Thus, the court concluded:

> So, notwithstanding the fact that the questioning at the precinct
> prior to the giving of *Miranda* warnings was highly improper I
> believe[,] I don't think that in any view of the evidence it can be
> said it [] led to the later waiver, that it under[m]ined [Petitioner's]
> voluntariness, and therefore the statement made after the *Miranda*
> warnings is properly admitted.

(*Id.*)

---

[11] Justice Yates ordered an independent source hearing to determine whether or not Merritt could identify Petitioner in court during trial (*see* Supp. Ruling Tr. (Dkt. 16-23), at 23), but a hearing was not held and Merritt did not identify Petitioner in court at trial.

**b.** **Defense Counsel's Pretrial Request**
**To Subpoena Merritt's Medical Records**
**For the Trial Court's *in Camera* Review**

On November 23, 2009, one week before *voir dire* commenced, the Honorable

Michael Sonberg, J.S.C., held a pretrial hearing with the parties.  At that hearing, Petitioner's

trial counsel, Jaffe, stated that, although the case was nearly two years old, the prosecution had

informed him only a few months earlier (in July 2009) that Merritt had "a psychological history"

and was "diagnosed as a paranoid schizophrenic."  (Pretrial Tr. (Dkt. 16-24), at 45.)  In light of

this diagnosis, Jaffe argued that he was entitled, "at a minimum[,] [to] have the [c]ourt look at

[Merritt's] records, either from the doctor or from whatever hospital made the diagnosis[,] to

make a determination" whether his mental condition affected his credibility.  (*Id.*, at 46.)

The court responded that, to its understanding, the condition of paranoid schizophrenia

would not render an individual "incompetent" to have made observations or to testify (*id.*, at 47),

but acknowledged there could be a question of "whether [Merritt] was experiencing

hallucinations or [was] on heavy medication that would have an impact on his ability to perceive

[either] at the time of the event or at the time he testified" (*id.*, at 46).  The court explained that,

in its view, "[w]hether [Merritt] [] had [experienced] episodes" from the time of the incident to

the time of the trial did not seem "at all relevant" (*id.*), but nonetheless informed Jaffe that, if he

provided "an appropriately limited subpoena," the court would sign it "for *in camera*

inspection," and would "look at the records and see whether [they reflected] any incidents of the

manifestation of paranoid schizophrenia" at the time of the relevant events[12] and currently (*id.*, at

---

[12] Although the transcript reflects that the court stated it would review Merritt's medical records for indications of his condition on "November 6, 2007" (Pretrial Tr. (Dkt. 16-24), at 48), this Court assumes that either the judge misspoke or there was a transcription error in the record, as the robbery occurred on November 26, 2007.

16

47-48).  Specifically, as to the relevant time frame, the court indicated that it would review the records for psychiatric consultations for approximately "three months before [the incident] to three months afterwards."  (*Id.*, at 48.)  The next day, Jaffe sought leave to bring the court a subpoena for signature, and the court granted that request.  (*See id.*, at 49.)

On December 2, 2009, during *voir dire*, but outside of the jurors' presence, Jaffe informed the court that the subpoena for Merritt's medical records mistakenly had been made returnable for December 9, rather than December 3.  (Trial Tr. (Dkt. 16-27), at 149.)  While Jaffe noted that he was "not making any applications at [that] time" (*id*.), the prosecution requested that he not mention on cross-examination "any psychiatric problems," to which Jaffe countered that he still had "a good faith basis to ask questions" concerning Merritt's medications (*id.*).

In defining the scope of the questioning that would be allowed, the court ruled that it would limit the questioning to the following:  (1) whether Merritt had been diagnosed "with a psychiatric condition"; (2) whether, at the time of the incident, he was taking medication that "had an impact on his ability to perceive and recall"; and (3) whether "he was delusional" at the time of the incident.  (*Id.*, at 151-52.)  The court also ruled that it would not permit Jaffe to introduce the name of Merritt's medical condition or ask questions about the specific diagnosis, reasoning that, without an expert to explain that diagnosis, "[a]ll [that questioning would do] is call on jurors to speculate and invite[] jurors to do improper research on their own."  (*Id.*, at 152.)

Later that same day, the court told counsel that, if Petitioner proffered expert medical testimony about schizophrenia, such testimony would "arguably [have] some relevance."  (*Id.*, at 172.)  When Jaffe suggested calling Merritt's treating doctor as a defense witness, the court stated that the treating physician could not be introduced as an expert but could serve as a fact witness, if her testimony would impeach Merritt's credibility.  (*See id.*, at 176-78.)

17

### 2. **The Trial**

### a. **Merritt's Testimony Prior to the Production of Medical Records**

At trial, both the prosecutor and Jaffe questioned Merritt about his criminal history[13] and his mental health, and the first part of that questioning took place prior to the court's receipt and review of the medical records.

Initially, on the prosecution's direct examination, Merritt confirmed that, in November 2007, he had been diagnosed with "a psychiatric condition." (*Id.* (Dkt. 16-28), at 58.) Then – apparently again referring to November 2007 – the prosecutor asked Merritt whether, in relation to that psychiatric condition, he had suffered from any hallucinations or delusions, and Merritt responded, "[n]one whatsoever." (*Id.*) Merritt also testified that he had been prescribed medication at that time and had been compliant with his medications. (*See id.*, at 58-59.) Merritt testified that he had not experienced any hallucinations or delusions from the date of the robbery to the time of the trial. (*See id.*, at 59.)

On cross-examination, when Jaffe returned to the issue of Merritt's "psychiatric condition" (*id.*, at 167), the court intervened and instructed the jury as follows:

> Members of the jury, I'm going to direct you, those of you with
> some medical training or knowledge, that you are not to speculate
> as to what the nature of the diagnosis was, the nature of the
> condition. You are not going to hear, as far as I understand, from
> any psychiatrist or psychologist as to what the diagnosis was. And
> this testimony is relevant[,] if you think it's relevant[,] on the issue
> of [] Merritt's ability to perceive and recollect at the time of the

---

[13] Petitioner's trial counsel elicited significant testimony on cross-examination regarding Merritt's criminal history, revealing to the jury that from 1968 through 1999, Merritt was separately convicted of, and incarcerated for, weapon possession and armed robbery; four theft-related misdemeanors and one misdemeanor involving a sawed-off shotgun; assault for stabbing his then-wife with knife; and felony drug sale. (*See* Trial Tr. (Dkt. 16-28), at 154-67; *see also id.* (Dkt. 16-29), at 213.)

> event and in his testimony today.  That's why I'm letting [] Jaffe
> go into this.

(*id.*, at 167-68).  Similarly, when Jaffe started to ask Merritt about his medications (*see id.*, at

169 (asking whether one of those medications was "an antipsychotic drug")), the court sustained

an objection from the prosecutor and instructed the jury:

> . . . the nature of the drugs isn't important.  I don't want any of you
> to understand that this means to start making a diagnosis.  The
> question is, would any of the drugs [] Merritt takes or that he was
> taking at the time affect his ability to perceive and recollect.

(*id.*).

Jaffe then asked Merritt questions about how many medications he took, and how often

he took them, eliciting testimony from Merritt that he took one medication for his psychiatric

condition, that it was "required" that he take it every day, but that he actually took it only on an

"as needed" basis, whenever he felt like he was "getting violent."  (*Id.* (Dkt. 16-29), at 171-73.)

Further, on cross-examination, Merritt testified that he had not taken the medication on the day

of the robbery, that he could not recall if he had taken it the night before the incident, and that he

also could not recall when, prior to that, he had last taken it.  (*See id.*, at 172-73.)  He also

testified that he had not taken the medication prior to testifying at trial, and he could not recall

when he had last taken it.  (*See id.*, at 174-75; *see also id.*, at 175 (Merritt testifying, ". . . it was

when I needed it, and I haven't been violent for a good considerable time, of being hostile, so it

must have been a while before I had the drugs").)

Jaffe asked the court for leave "to go into [the question of Merritt's medications] a little

further," but the court denied that request, reiterating its earlier ruling that it was only "relevant"

whether the medication had an "impact on [Merritt's] ability to discern or recall."  (*Id.*, at

176-77.)  At the same time, the court informed counsel that it just received and would review

Merritt's medical records.  (*See id.*, at 177.)  The court recessed trial from that evening

(Thursday, December 3, 2009), to the following Monday afternoon (December 7, 2009).

### b.  Merritt's Medical Records

There is a fair amount of colloquy in the trial transcript regarding the medical records that

document Merritt's mental health condition from October 2007 through January 2009.  Although

most of those records ultimately were not made available to the jury, copies appear in the State

Court Record, as exhibits to Petitioner's post-trial Section 440.10 motion, which is discussed

below.  (*See* Background, *infra*, at Section (B)(4).)  In relevant part, these documents state the

following:

On November 2, 2007, Merritt reportedly "missed" his scheduled outpatient treatment

appointment.  (Dkt. 16-7, at SR 182.)  The "Outpatient Treatment Plan" from that date notes that

he had "[a]ctive symptoms of psychosis," and "[p]aranoid ideation, [with] chronic negative

thoughts to harm others."  (*Id.*, at SR 183.)  In addition, Merritt was described as being at "high

risk for relapse of presenting symptoms," and his prescribed medications were listed as

Depakote, Zyprexa, Paxil, and Neurontin.[14]  (*Id.*)  His "active diagnosis" was "Schizophrenia,

---

[14]  Depakote "is used to treat certain types of seizures (epilepsy). . . . [It] is also used to treat the manic phase of bipolar disorder (manic-depressive illness)."  *Valproic Acid (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/drg-20072931 (last visited Apr. 21, 2020).  Zyprexa "is used to treat nervous, emotional, and mental conditions (eg, schizophrenia)."  *Olanzapine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/olanzapine-oral-route/description/drg-20071350 (last visited Apr. 21, 2020).  Paxil "is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, generalized anxiety disorder (GAD), social anxiety disorder (also known as social phobia), . . . and posttraumatic stress disorder (PTSD)."  *Paroxetine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/paroxetine-oral-route/description/drg-20067632 (last visited Apr. 21, 2020).  Neurontin "is used to help control partial seizures (convulsions) in the treatment of epilepsy."  *Gabapentin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Apr. 21, 2020).

Paranoid Type," and, according to the treatment plan, he was to "be discharged when he no longer present[ed] with acute symptoms of psychosis without medications for [six] consecutive months." (Dkt. 16-8, at SR 184.)

On November 13, 2007, Merritt attended his rescheduled appointment, and the "Psychopharmacology Note" from that date indicates that he "seem[ed] psychiatrically stable," had "sometimes missed appointments, but [was] mostly compliant with his meds." (*Id.*, at SR 187.) Upon a mental status examination, Merritt's "delusion content" was described as "mild PI,"[15] and the note includes an admission that "he ha[d] not been taking his meds regularly." (*Id.*)

On November 15, 2007, Merritt attended another appointment, and the medical record from that date indicates that he had "engaged in treatment" and had a "positive response to treatment interventions." (Dkt. 16-9, at SR 192.) There were "[n]o noted changes in mental status," and Merritt "report[ed] medication compliance." (*Id.*) His active diagnosis remained "Schizophrenia, Paranoid Type," but there was "no evidence of [delusions] at [the] time." (*Id.*)

On November 17, 2007, a "Psychosocial Assessment" of Merritt was conducted and the documentation notes that he "[kept] treatment apts." and was "able to be engaged in treatment and establish relationships with providers," although he had a "[p]oor ability to comply with medication at times." (*Id.*, at SR 197.) This Psychosocial Assessment was apparently the last medical note recorded before the robbery.

---

[15] The term "PI" is not defined in the medical record from November 13, 2007. (*See* Dkt. 16-8, at SR 187.) This Court assumes it is likely that "PI" stands for "paranoid ideation" – the term referenced in Merritt's medical record from November 2, 2007. (*See* Dkt. 16-7, at SR 183; *see also* Trial Tr. (Dkt. 16-29), at 193 (defense counsel seemingly suggesting this meaning of the abbreviation, despite his misstatement (or the court report's transcription error) that the abbreviation referred to "paranoid idealization").)

As for medical records post-dating the incident, the State Court Record contains only two documents – a "Patient Event Note" dated January 17, 2008, in which Merritt's case worker reported that Merritt had claimed compliance with his medication and had said he was "robbed at gunpoint" (Dkt. 16-10, at SR 200), and a January 24, 2008, "Psychopharmacology Note," indicating that Merritt had "been stable" and that he "[s]ometimes misse[d] appointments, but [was] mostly compliant with his meds" (*id.*, at SR 202).  The latter of these January notes further states:  "Despite being recently robbed at knifepoint, Patient denied any new symptoms, denied any problem falling or staying asleep, or side effects of the medication and was reported by patients [sic] primary therapist to be essentially at baseline." (*Id.*)  Merritt's "delusion content" as of January 24 was reported as "mild PI" with delusions "[n]ot evident" and psychotic symptoms as "absent." (*Id.*)  The diagnosis remained "Schizophrenia, Paranoid Type."  (*Id.*, at SR 204.)

After it conducted its review of the medical records, the court disclosed the November, December, and January records to the parties but noted that many of them would not be permitted into evidence if offered.  (*See* Trial Tr. (Dkt. 16-29), at 184-85.)  The court explained that it was "still troubled by the concept of naming any of [the] drugs or naming the psychosis without any medical testimony to explain to the jury what any of this stuff means."  (*Id.*)

Upon his own review of the records, Jaffe made several oral applications to the court, seeking leave to question Merritt about his psychological condition in additional respects.  (*See id.*, at 190.)  First, Jaffe raised the fact that the November 13, 2007 record "talk[ed] about thought disorder [and] delusional content," and indicated that Merritt "[did] not agree to comply with the medicine."  (*Id.*, at 191.)  On this point, the court granted Jaffe leave to question Merritt as to whether he was experiencing delusions at that time and regarding his compliance with treatment.  (*See id.*, at 193-94).

Second, Jaffe sought leave to enter all of the medical records from November 2007 into evidence, with "appropriate redactions," and sought permission to question Merritt regarding the nature of at least one of his medications, Zyprexa, which Jaffe characterized as an "antipsychotic drug," and which Jaffe understood to be the one drug that Merritt had testified to using "as needed." (*See id.*, at 194-200.)  On this point, the court ruled that it would allow Jaffe to mark those records for identification and show them to Merritt during re-cross-examination, but they were not to be shown to the jury or admitted into evidence. (*See id.*, at 195-96, 199-200; *see also id.*, at 200-01 (court stating, "[W]hat I would suggest you do is circle the Zyprexa on one of the reports and show it to him and ask him without reading the name out loud to say whether or not that is something he takes on a daily bas[i]s, how many he takes, whatever you want to ask him about that, but I would like if at all possible to keep the names of the medications away from the jury because no one's calling anyone to tell them what any of this stuff means, okay?").)

Finally, Jaffe informed the court that he intended to question Merritt regarding the "active symptoms of psychosis" that he had apparently exhibited at a medical visit on November 2, 2007 (*id.*, at 201); the court reiterated that it would allow questioning only within the parameters of its prior rulings (*see id.*, at 201-03).

### c.      Continued Testimony by Merritt

On December 7, 2009, Jaffe resumed his cross-examination of Merritt. (*See id.*, at 204.) In response to Jaffe's questioning (in which Jaffe did not name a particular medication), Merritt clarified that he knew he "was required" to take his psychiatric medicine "daily," but, despite this, he took it only when he "need[ed]" it, and had not taken it every day in November 2007. (*Id.*, at 205-06, 207.)  After this questioning, the court gave the jury the following instruction:

> Members of the jury, let me explain why we're doing [] things this
> way, because I'm sure it [is] a little awkward to you, neither side is

> calling a psychiatrist, psychologist or pharmacologist to testify
> about any of these medications.
>
> So, I don't want any of you to sit here and maybe know something
> about them from some other source, maybe bec[o]me curious
> about them and be tempted to do some research[.]  [W]hat the
> medications are, the names of the medications are not important.
>
> You are not to guess as to what they are, the issue is whe[ther] or
> not Mr. Merritt was properly self-medicated is what Mr. Jaffe is
> inquiring about.

(*Id.*, at 207-08.)  Jaffe then showed Merritt one of his medical records from November 2007,

with a particular medication circled, and asked if he remembered that he was supposed to take

"two pills" of that medication "every night."  (*Id.*, at 208-09.)  Merritt responded that he "never

knew [he] had to take this particular medication two tablets every night."  (*Id.*)  Jaffe also asked

Merritt to confirm that he was suffering from delusions in November of 2007, but Merritt denied

that this was true.  (*See id.*, at 213.)

### d.     <u>Extent to Which the Medical Records Were Placed in Evidence</u>

On December 11, 2009, after the examination of Merritt was completed, the court issued

a ruling that allowed only limited portions of the medical records to be placed in evidence, with

redactions.  (*See id.* (Dkt. 16-31), at 633-44.)  Specifically, the court instructed the parties to

redact any references to Merritt's particular diagnosis and treatment plan, including his specific

medications.  (*See id.*, at 635; *see also id.*, at 642.)  In addition, the court ordered the redaction of

all references to Merritt's delusion content (for example, "Mild PI").  (*See id.*, at 635-36.)

Jaffe objected, stating his view that the treatment plan reflected a chronic problem that

should be in evidence.  (*See id.*, at 637.)  The court responded, "[L]et me reiterate something I

reminded you of when we were discussing this, is that I offered to sign an order for a psychiatrist

to review the records[16] and . . . testify if you thought that that would be helpful.  And, by your

lack of application, I assume you made a decision that that was not something you wanted to

do.”  (*Id.*, at 637-38.)  Although Jaffe initially replied, “[t]hat’s correct” (*id.*, at 638), he then

argued that he had not called an expert because it was his understanding the court would not

allow “generalized statements from [a] psychiatrist or psychologist who ha[d] not seen [] Merritt

[or] dealt with him at all” (*id.*, at 641).  In response to this contention, the court clarified that it

would have permitted an expert to testify that he or she had reviewed the medical records and

“had an opinion to a reasonable degree of medical certainty as to [] Merritt’s condition at any

point in time reflected in the medical record,” but that Jaffe had “never asked . . . what a

psychiatrist could testify about.”  (*Id.*, at 643.)  Nonetheless, after this colloquy, the court ruled

that Jaffe could introduce a portion of the records that attested to Merritt’s non-compliance with

medication.  (*See id.*, at 638-39.)

On December 14, 2009, Jaffe informed the court that Petitioner was not going to offer

any medical records in evidence and moved on behalf of his client to strike the exhibit consisting

of those redacted records from the trial record.  (*See id.*, at 648-49.)  The court granted that

motion, but then also granted the prosecution’s motion to offer a limited portion of the redacted

records in evidence.  (*See id.*, at 648-59.)  Ultimately, only two redacted pages were placed

before the jury – the November 15, 2007 record, noting “no evidence of delusions” at that time,

and the November 17, 2007 Psychosocial Assessment, noting that Merritt kept appointments but

had a “[p]oor ability to comply with medications.”  (Dkt. 16-11, at SR 209-12.)

---

[16]  It appears that, when the Court referred to its offer to “sign an order for a psychiatrist to review the records” (Trial Tr. (Dkt. 16-31), at 637-38), it was referring to an earlier discussion with counsel that was either off the record or otherwise omitted from the State Court Record.

e.     **Summation**

In summation, Jaffe argued, *inter alia*, that Merritt, the "sole" witness to the robbery, "was neither credible nor reliable" (Trial Tr. (Dkt. 16-31), at 665), and pointed to the following factors in support:  (1) Merritt's "extensive criminal record spanning an approximately [30] year period" (*id.*); (2) Merritt's "chronic psychological condition dating back some [30] years" (*id.*, at 666); (3) Merritt's non-compliance with his psychiatric medications and his untruthfulness at trial regarding the extent of his compliance (*see id.*); and (4) the implication that Merritt occasionally suffered from delusions, as shown by the redacted medical records and his letters to the District Attorney's Office (*see id.*, at 672-73; *see also id.* (Dkt. 16-32), at 675 (suggesting that Merritt had "paranoid fantasies")).

### 3.     Verdict and Sentencing

The jury found Petitioner guilty of all charges on which he was tried.  (*See id.* (Dkt. 16-32), at 778-84.)  On March 23, 2010, Justice Sonberg sentenced Petitioner, as a persistent violent felony offender, to concurrent prison terms of 20 years to life on each of the burglary, robbery, and weapon possession counts, and to prison terms of 10 and six years, respectively, on each of the narcotics counts.  (*See* Sentencing Tr. (Dkt. 16-32), at 6, 13-15.)

### 4.     Section 440.10 Motion To Vacate the Judgment

On December 5, 2012, Petitioner, represented by appellate counsel, moved pursuant to Section 440.10 of the New York Criminal Procedure Law, to vacate the trial court's judgment of conviction against him.  (*See* Affirmation of Molly K. Grovak, Esq., in Support of Motion to Vacate Judgment, sworn to Nov. 5, 2012 ("Grovak Affirm.") (Dkts. 16-5, 16-6), at SR 120-37, and Exhibits thereto (Dkts. 16-7 to 16-12), at SR 179-245; Memorandum of Law in Support of Defendant's Motion Pursuant to New York Criminal Law § 440.10 to Vacate Judgment of

Conviction, dated Nov. 5, 2012 ("Pet. § 440.10 Mem.") (Dkt. 16-6), at SR 138-66; (Dkt. 16-7), at SR 167-78.)  In that motion, Petitioner claimed that he was denied the effective assistance of counsel under state and federal law, based on his counsel's allegedly inadequate representation prior to and during the trial.  (*See generally* Grovak Affirm. ¶ 2; Pet § 440.10 Mem., at SR 140.)

More specifically, in his Section 440.10 motion, Petitioner faulted Jaffe for failing to present expert evidence to show that Merritt had been diagnosed with paranoid schizophrenia and was non-compliant with his medications.  (*See* Grovak Affirm. ¶ 43; Pet. 440.10 Mem., at SR 171.)  Central to Petitioner's claim was that Jaffe (1) did not conduct adequate pretrial investigations, with the result that Jaffe did not obtain Merritt's medical records until after the trial had started; (2) failed to consult or call a medical expert; and (3) failed to explore and make effective use of the evidence of Merritt's psychiatric condition during cross-examination, which could have undermined his credibility.  (*See* Grovak Affirm. ¶¶ 39-44; Pet. 440.10 Mem., at SR 166-74.)  Petitioner argued that there was no "reasonable strategy" for Jaffe's failure to introduce evidence of Merritt's diagnosis of paranoid schizophrenia and his delusions.  (*See* Grovak Affirm. ¶ 45; Pet. 440.10 Mem., at SR 168.)

In support of his Section 440.10 motion, Petitioner submitted an Affidavit of Dr. Myles S. Schneider, a New York State licensed psychiatrist and a board-certified diplomate in the areas of psychiatry and forensic psychiatry.  (*See* Affidavit of Myles S. Schneider, M.D., sworn to June 20, 2012 ("Schneider Aff.") (Dkt. 16-12), at SR 230-36.)  Dr. Schneider, who reviewed Merritt's unredacted medical records and letters to the District Attorney's Office, stated that, if he had been called to testify at trial, he would have testified that Merritt's psychiatric diagnosis could have affected his ability to perceive and accurately recall the events underlying the robbery.  (*See* Schneider Aff. ¶¶ 6-7.)  According to Dr. Schneider, "psychotic

disorders," like schizophrenia, "are associated with abnormal thinking and perception," which

can result in delusions.  (*Id.* ¶ 9.)  Based on the fact that Merritt's medical records indicated "he

was experiencing paranoid ideation around the time of the incident" (*id.* ¶ 21), Dr.  Schneider

opined that, "although [Merritt] was not necessarily delusional at the time of the [robbery], he

was experiencing an exaggerated belief or suspicion that he was being harassed, persecuted, or

treated unfairly" (*id.*).  In addition, based on the letters, Dr. Schneider opined that Merritt "was

likely experiencing active symptoms of schizophrenia in May[17] and December of 2007."

(*Id.* ¶ 22.)  Further, Dr. Schneider suggested that Merritt "appeared to have been experiencing

active symptoms of paranoia when he testified at trial."  (*Id.* ¶ 23 (stating that Merritt had been

"overheard by two jurors making statements like 'they were trying to kill him'").)  According to

Dr. Schneider, had he been consulted, he would have "advised [Jaffe] to attempt to obtain

[] Merritt's records from earlier in his life to further explore" his criminal record and its effect on

his mental health.  (*Id.* ¶ 27.)  Moreover, he stated that he would have advised Jaffe to "explore

the possibility that [] Merritt was actively using drugs" given that Merritt's "diagnosis of

Hepatitis C strongly indicate[d] a history of drug abuse."   (*Id.* ¶ 28.)

On January 15, 2013, the People filed an opposition to Petitioner's Section 440.10

motion, arguing that his claims were without merit.  (*See generally* Memorandum in Response to

the Defendant's C.P.L. § 440.10 Motion to Vacate the Judgment[], dated Jan. 15, 2013

(Dkt. 16-13), at SR 246-58; *see also* Affirmation in Support of Service by Mail, dated Jan. 15,

2013 (Dkts. 16-12, 16-13), at SR 244-45.)  On February 25, 2013, Petitioner filed a reply.  (*See*

---

[17] Although Dr. Schneider's affidavit indicates that he reviewed Merritt's "Stipulation" to
the District Attorney's Office, which was "signed and notarized on May 27, 2007" (Schneider
Aff. ¶ 7), this Court assumes that this is a transcription error, as the "Stipulation" is in fact dated
May 27, 2008 (*see* Dkt. 16-12, at SR 219-21).

Affirmation in Reply in Support of Motion to Vacate Judgment, sworn to Feb. 25, 2013

(Dkt. 16-13), at SR 262-84.)

### 5. The Trial Court's Denial of the Section 440.10 Motion

On April 30, 2013, in a detailed opinion, Justice Sonberg denied Petitioner's

Section 440.10 motion in its entirety. (*See* Decision on Motion to Vacate Judgment of

Conviction, dated Apr. 30, 2013 ("Section 440.10 Decision") (Dkts. 16-14, 16-15), at

SR 285-302.) The court reviewed Petitioner's claims and held that it "[could] not reasonably

conclude that counsel's failure to present expert psychiatric evidence showing adverse effects of

schizophrenia on Merritt's testimony deprived [Petitioner] of his constitutional right to effective

assistance of counsel." (*Id.*, (Dkt. 16-14), at SR 294.)

Starting with the issue of Jaffe's investigation into the medical records, the court noted

that Jaffe "was not blind to the importance of medical evidence," and had "articulated his trial

strategy during his opening statement and sought to build the defense around Merritt's

psychiatric condition around the time of the crime and how it affected his mental state and

therefore his ability to perceive." (*Id.*) "To that end," the court found that Jaffe had "pursued the

strategy of seeking to undermine Merritt's credibility through cross-examination," and had

chosen to execute that strategy, in part, by seeking and receiving the court's "signed subpoena

for Merritt's medical records." (*Id.*) According to the court, "[i]t was clear that [Jaffe] reviewed

the redacted medical records and had the benefit of them before cross-examining Merritt." (*Id.*)

Turning to Petitioner's contention that Jaffe had no strategic basis for failing to call an

expert to testify at trial, the court noted there is no "'*per se* rule requiring a defense counsel to

consult with a medical expert [in] order to cast doubt on a key prosecution witness." (*Id.* (quoting

*Bell v. Miller*, 500 F.3d 149, 157 (2d Cir. 2007)).) The court then stated that, "[e]ven if [it] were

to conclude that [Jaffe's] decision at trial not to call an expert was the result of error rather than trial strategy, such an error, weighed against the evidence presented at trial, did not prejudice [Petitioner]." (*Id.*, at SR 294-95.)  In support of this determination, the court explained that Jaffe's "failure to call an expert was not outcome determinative as there was substantial corroborating evidence of the crimes." (*Id.*, at SR 295.)  More particularly, the court stated that expert medical testimony "would not have had a pivotal impact such as to deem Merritt's testimony so incredible as to be the product of delusion." (*Id.*)  On this point, the court noted that the jury heard during the trial that Merritt had a long psychiatric history, that he was on various psychotropic medications, and that, at times, he was non-compliant with his medications. (*See id.*)  In addition, the jury heard the 911 call, heard evidence that Petitioner "was caught virtually red handed with a loaded weapon at the scene within minutes of the 911 call," had been informed that Merritt's property was recovered from McDaniel at the scene, and heard Petitioner's post-arrest statement placing himself at the Hotel and admitting to being in possession of a weapon. (*Id.*)  "Under these circumstances," the court found, "expert psychiatric testimony would not have been sufficient to affect the ultimate verdict in [Petitioner's] favor." (*Id.*, at SR 295-96.)  The court also reasoned that "expert opinions such as those proffered by Dr. Schneider would not have undermined the prosecution['s] case . . . [because they] would have established essentially the same facts that counsel was able to demonstrate on cross-examination, namely that Merritt was non-compliant with his psychotropic medications." (*Id.*, at SR 297-98.)  Thus, the court determined, testimony from an expert such as Dr. Schneider "would have been of marginal value." (*Id.*, at SR 298.)

The court further noted that it was important to remember that Merritt's ability to *identify* Petitioner was not at issue in the case. (*See id.*)  Indeed, in the court's view, Petitioner's motion

had "ignore[d] the fact that Merritt made no in-court identification" of Petitioner, due to a successful pretrial motion by Jaffe.  (*Id.*)  "While witness credibility is always an important component of how a jury forms its decision," the court explained that this case was not a "'credibility contest,'" wherein "potential expert testimony could [have been] used to undermine the victim's credibility with the jury."  (*Id.*)  "Stated differently," the court found that "there was no strategic need" for Jaffe to have "present[ed] an aggressive defense on this issue because expert psychiatric testimony would not have had a determinative impact on the outcome of the proceeding."  (*Id.*)  Rather, the court reasoned, had Jaffe called an expert witness, "the testimony would have established essentially the same facts that [he] was able to demonstrate on cross-examination, namely that Merritt was non-compliant with his psychotropic medications."  (*Id.*, at SR 298.)  "Viewing the totality of the evidence before the jury," the court determined that "an expert would [have] only marginally assist[ed] the jury" and, thus, Jaffe's "decision not to call an expert [was] more likely to [have] fall[en] within the bounds of reasonable performance and less likely to [have] prejudice[d] [Petitioner]."  (*Id.* (citing *Massaro v. United States*, 2004 WL 2251679 (S.D.N.Y., Oct. 5, 2004)).)

Lastly, with respect to Petitioner's contention that Jaffe's representation was deficient because he failed to introduce the medical records into evidence, the court observed that, while it did not need to "speculate as to counsel's strategy," "an experienced attorney such as [Jaffe] could have legitimately concluded that, as a tactical matter, it was best not to introduce the records."  (*Id.*, at SR 299.)  "After all," the court stated, "while some of the information in the medical records show[ed] that Merritt was experiencing symptoms, the records for the dates close to the date of the robbery . . . indicated that [he] was stabilized," and one report corroborated Merritt's statement that he was "robbed at gun point."  (*Id.*)  After noting that Jaffe

elicited significant testimony from Merritt that "explored [his] criminal background," "delved into the letters [he wrote] about a conspiracy to the District Attorney," and showed that he "was non-compliant with his medications" (*id.*), the court "identifie[d] no constitutional error in counsel's failure to pursue further cross-examination based on relatively small inconsistencies in the medical records" (*id.*, at SR 300).

In its conclusion, the court rejected Petitioner's final suggestion that Jaffe's alleged "errors" – when considered as a whole – had denied him a fair trial.  (*Id.*, at SR 301.)  According to the court, "[m]any of the alleged errors were not errors at all, and consideration of the record as a whole demonstrate[d] that [Petitioner] received a fundamentally fair trial."  (*Id.*)  "Since the record demonstrate[d] that, viewed in its totality, [Jaffe's] performance on behalf of [Petitioner] constituted meaningful representation," the court accordingly held that Petitioner "was not deprived of the effective assistance of counsel under the New York State Constitution."  (*Id.*, at SR 302.)  In addition, the court held that Petitioner was not deprived the effective assistance of counsel under the federal constitution where the "record established that counsel's representation did not fall below an objective standard of reasonableness or that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the [case] would have been different." (*Id.*)

By application dated May 29, 2013, Petitioner sought leave to appeal to the Appellate Division from the trial court's denial of his Section 440.10 motion.  (*See* Dkts. 16-15 to 16-17, at SR 303-80.)  In his leave application, Petitioner argued that his motion should have been granted on the basis that he received ineffective assistance of counsel, in violation of his state and federal constitutional rights.  (*See* Dkt. 16-16, at SR 346-67.)  The People opposed the leave application. (*See* Dkt. 16-17, at SR 381-86.)  On July 24, 2013, the Appellate Division issued a Certificate

Granting Consolidation with Direct Appeal.  (*See id.*, at SR 387 (showing date of entry as Aug. 20, 2013).)

### 6. __Direct Appeal__

Acting through appellate counsel, Petitioner also filed a direct appeal from his conviction, which, as noted above, was consolidated with his appeal from the denial of his Section 440.10 motion.  (*See id.*)  In his opening brief to the Appellate Division, First Department, Petitioner raised two claims:  (1) the same claim that he had raised in his Section 440.10 motion – *i.e.*, that he had received ineffective assistance of trial counsel in violation of his state and federal constitutional rights; and (2) that his right to remain silent, as guaranteed by the federal and state constitutions, was violated by the admission of an unlawfully procured, post-arrest statement that he made to the police.  (*See generally* Brief for Defendant-Appellant, dated Dec. 19, 2013 ("Pet. App. Mem.") (Dkt. 16-7), at SR 388-458.)

Petitioner's arguments relating to his ineffective-assistance claim essentially mirrored those in his Section 440.10 motion.  (*See id.*, at SR 422-45.)  As to his second claim, Petitioner argued that his waiver of his *Miranda* right to remain silent was invalid "because it came in the middle of a continuous course of custodial interrogation by the police."  (*Id.*, at SR 446.)  In support, Petitioner cited to both the federal and state constitutions for the proposition that "[t]he prosecution may not use statements obtained from a custodial interrogation without first establishing that the individual had been adequately advised of his constitutional rights to remain silent and to have an attorney present before questioning."  (*Id.*)   In particular, he cited to a New York Court of Appeals case, *People v. Chapple*, 38 N.Y.2d 112 (1975), for the proposition that a *Miranda* warning is "generally ineffective unless it '*precede[s]* the subjection of a defendant to questioning,'" and that only where there is a "definite, pronounced break in the interrogation"

may it be said that the defendant can "return[], in effect, to the status of one who is not under the influence of questioning." (*Id.*, at SR 446-47, 526 (quoting *Chapple*, 38 N.Y.2d at 115 (emphasis in original)).)  Based on this authority, Petitioner argued that the "nearly seamless connection between the two parts of [Sergeant Salomons'] interrogation" after the arrest had "invalidated [Petitioner's] supposed waiver of his right to remain silent." (*Id.*)

The People opposed the appeal (*see* Brief for Respondent, dated Sept. 2014 (Dkt. 16-17), at SR 459-534), and Petitioner filed a reply brief (*see* Reply Brief for Defendant-Appellant, dated Oct. 10, 2014, *id.*, at SR 535-68).

By decision dated December 2, 2014, the Appellate Division, First Department, unanimously affirmed Petitioner's conviction and sentence.  *See People v. Bracey*, 997 N.Y.S.2d 420 (1st Dep't 2014) (copy included in the State Court Record (Dkt. 16-18), at SR 569-72).  As to Petitioner's ineffective-assistance-of-counsel claim, the Appellate Division held:

> [Petitioner] has not established that his trial counsel's alleged errors resulted in prejudice under the state or federal standards. Regardless of whether counsel should have obtained the victim's medical records earlier, and regardless of whether counsel should have consulted an expert or called one to testify about the victim's mental health, [Petitioner] has not shown a reasonable possibility that such an impeachment of the victim would have been any more successful than the impeachment devices counsel did employ at trial.

*Bracey*, 997 N.Y.S.2d at 421-22 (internal citations omitted).

As to Petitioner's *Miranda* violation claim, the Appellate Division held:

> The officer's pre-*Miranda* questions constituted improper custodial interrogation, because even though these questions purported to inquire only about unrelated criminal activity for intelligence-gathering purposes, they were "reasonably likely to elicit an incriminating response" under the particular circumstances of the case.  However, the post-*Miranda* statements were admissible because "the circumstances presented here do not constitute a single continuous chain of events" in light of, among other things,

>the limited extent of the *Miranda* violation, the officer's statement
>clarifying that the "first part" of the interview would be unrelated
>to defendant's case, and the lack of any other indication of
>coercive police conduct.

*Id.*, at 422 (internal citations omitted).

By letter dated January 2, 2015, Petitioner, through counsel, sought leave to appeal to the New York Court of Appeals; that letter enclosed the briefs submitted to the Appellate Division and also requested "the opportunity to file a supplemental letter with the judge to whom this application will be assigned." (Letter to the Honorable Jonathan Lippman from Molly K. Grovak, Esq., dated Jan. 2, 2015 (Dkt. 16-18), at SR 573-74.) On January 30, 2015, Petitioner, through counsel, submitted a supplemental letter, setting out certain specific reasons why leave to appeal should be granted. (*See* Letter to the Honorable Susan Phillips Read from Molly K. Grovak, Esq., dated Jan. 30, 2015, *id.*, at SR 575-87.) In that submission, Petitioner claimed to raise two "leave-worthy" issues: (1) "the significance of Pre-*Miranda* questioning under the *Chapple* [s]tandard," and (2) "the standard for ineffective assistance in pre-trial investigations" after *People v. Oliveras*, 21 N.Y.3d 339 (2013). (*Id.*, at SR 581, 583.) Petitioner then relied heavily on state law for each argument, although, in reference to his ineffective-assistance claim, he also cited to *Strickland v. Washington*, 466 U.S. 668 (1984). (*See id.*)

On July 13, 2015, the Court of Appeals issued an Order denying leave to appeal without opinion. *See People v. Bracey*, 25 N.Y.3d 1198 (2015) (copy included in the State Court Record (Dkt. 16-18), at SR 596.)

### 7.    __Federal Habeas Petition__

Petitioner, proceeding *pro se*, commenced this action by filing an undated Petition that

the Court received on October 7, 2016.  (*See generally* Pet.)[18]  The Petition, construed

liberally,[19] raises two grounds for habeas relief.  First, Petitioner again claims that he received

ineffective assistance of trial counsel.  (*See id.* (attachment), at ECF 15.)  As the particular

grounds for this claim, Petitioner alleges that his trial counsel was ineffective for (a) failing to

investigate the paranoid schizophrenia diagnosis of Merritt, "whose credibility was the sole issue

at trial";

(b) failing "to consult with an expert at the court's urging"; and (c) failing "to introduce an

expert or medical records showing that [ ] Merritt was a paranoid schizophrenic who was

non[-]compliant with his medication."  (*Id.*)  Second, Petitioner claims that his post-arrest

statement, made after he received *Miranda* warnings, should have been suppressed because (a) it

---

[18] Under the so-called "prison mailbox rule," *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied*, 534 U.S. 886, a *pro se* prisoner's habeas petition is deemed "filed" on the date he gives it to prison officials for delivery to the court, *see id.*; *Houston v. Lack,* 487 U.S. 266, 270 (1988).  Where a petition does not attest to the date on which the petitioner placed his petition in the prison mailing system, courts will look to the date on which the petition is signed to determine the filing date.  *See, e.g.*, *Costilo v. United States*, Nos. 13cv4298 (PGG) (JLC), 98cr0438 (PGG), 2012 WL 9500631, at *1 n.3 (S.D.N.Y. Nov. 12, 2012), *report and recommendation adopted by* 2016 WL 1610609 (Apr. 20, 2013); *Peralta v. Connelly*, No. 06cv5360 (DAB) (MHD), 2008 WL 8050791, at *4 n.6 (S.D.N.Y. Apr. 18, 2008), *report and recommendation adopted by* 2010 WL 3219326 (Aug. 11, 2010).  Here, the Petition is undated and contains no statement as to when Petitioner provided it to prison officials for mailing.  As discussed below, however, there is no issue in this case as to the timeliness of the Petition (*see* Discussion, *infra*, at Section II(A)), and this Court need not take further steps to ascertain the precise filing date.

[19] This Court is required to interpret the pleadings of a *pro se* litigant "liberally [] in his favor."  *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*."  (internal quotation marks and citations omitted; emphasis in the original) (collecting cases)).

was "obtained as the result [of] a deliberate two-stage interrogation," and (b) "no curative steps were taken in this case in violation [of] *Missouri v. Seibert*."  (Pet. (attachment), at ECF 17.)

Respondent filed an Answer to the Petition on March 27, 2017 (Dkt. 16), together with a memorandum of law in opposition (*see generally* Resp. Mem.), and the State Court Record and transcripts referenced above.  Petitioner made three separate submissions in reply:  first, a "traverse," which he filed on or about April 13, 2017 (*see* Traverse, dated Apr. 13, 2007 ("Pet. Traverse") (Dkt. 18)), and which particularly addressed Respondent's argument that his *Seibert* claim was unexhausted; second, a memorandum of law, which he filed on May 1, 2017 (Memorandum of Law of Writ of Habeas Corpus, dated May 1, 2017 ("Pet. Reply Mem") (Dkt. 19)), and which addressed both of his habeas claims; and, third, a supplemental memorandum of law, which he filed on or about July 12, 2017 (Memorandum of Law in Response to the Respondent's Opposition to Petitioner's Writ of Habeas Corpus, sworn to July 12, 2017 ("Pet. Supp. Reply Mem.") (Dkt. 23)), which again addressed both claims.

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

### A.    Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within one year of the latest of four dates specified by statute, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[20]  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*, 237

---

[20] The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially

F.3d 147, 150-51 (2d Cir. 2001) (holding that judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari"). The limitations period is tolled during the pendency of any "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2).

### B. Exhaustion of State Remedies

A federal court generally may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies for his federal claims. 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*, 404 U.S. 270, 274 (1971) (exhaustion requirement, as now codified in AEDPA, "reflects a policy of federal-state comity").

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . [his] federal rights." *Picard*, 404 U.S. at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). A petitioner may fairly present a federal claim in several ways, including by citing relevant provisions of the federal Constitution in his appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by relying on "pertinent federal cases employing constitutional analysis" or "state cases employing constitutional analysis in like fact situations," *see Mallet v. Miller*, 432 F. Sup. 2d 633, 374 (S.D.N.Y. 2006)

---

recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(B)-(D).

(enumerating the ways a petitioner may fairly present his federal claims in state court).  Raising a

claim purely in state-law terms will generally be insufficient to exhaust the federal claim.  *See*

*Legrand v. Lee*, No. 13cv05282 (PKC) (KHP), 2016 WL 7468195, at *8–9 (S.D.N.Y. Dec. 28,

2016), *report and recommendation adopted*, 2017 WL 837683 (Mar. 2, 2017) (discussing

*Diguglielmo v. Senkowski*, 42 Fed. App'x 492, 495 (2d Cir. 2002) (Summary Order)).  Under

certain circumstances, however, even "a minimal reference" to the appropriate Constitutional

provision can potentially satisfy the exhaustion requirement.  *Reid v. Senkowski*, 961 F.2d 374,

376 (2d Cir. 1992).

　　　　Aside from setting out the federal nature of his claims, the petitioner must also, for

purposes of the exhaustion requirement, present those claims to "the highest court of the

pertinent state."  *Chebere v. Phillips*, No. 04cv296 (LAP), 2013 WL 5273796, at *19 (S.D.N.Y.

Sept. 18, 2013) (quoting *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)).  Where a petitioner

has been convicted in a New York state court, he may exhaust a federal claim challenging his

conviction by presenting the claim on direct appeal to the Appellate Division, and then by

seeking leave to appeal to the New York Court of Appeals.  *Galdamez v. Keane*, 394 F.3d 68, 74

(2d Cir. 2005).  Where a claim is not appropriate for direct appeal because it cannot be

demonstrated on the basis of the pretrial or trial record, a petitioner may exhaust the claim by

raising it to the state trial court in a collateral post-conviction motion, typically in a motion made

pursuant to Section 440 of the New York Criminal Procedure Law.  *See, e.g.*, *Reyes v. Phillips*,

No. 02cv7319 (LBS), 2005 WL 475544, at *4 (S.D.N.Y. Mar. 1, 2005) ("[A] motion under N.Y.

Crim. Proc. Law § 440.10 was the appropriate vehicle with which to exhaust [the petitioner's]

ineffective-assistance-of-counsel claim insofar as it relied upon evidence outside the record."),

and by then seeking leave to appeal to the Appellate Division, *see Ture v. Racette*,

No. 9:12cv01864 (JKS), 2014 WL 2895439, at *4 (N.D.N.Y. June 26, 2014).[21]

### C.   Procedural Default of Federal Habeas Claims

As a general matter, federal habeas review is not available where a claim has been raised

before the state courts, and the last-reasoned decision of the state courts "rests on a state law

ground that is independent of the federal question and adequate to support the judgment."

*Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *see also Ylst v. Nunnemaker*, 501 U.S. 797,

803 (1991).  Such a state-law ground may involve the application of a procedural rule, such as a

state rule requiring a defendant to raise a contemporaneous objection at trial in order to preserve

an issue for appeal.  *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977).  For the state-law ground to

be found to have provided an "independent" basis for the state court's decision, the court's

reliance on that ground "must be clear from the face of the opinion."  *Fama v. Comm'r of Corr.*

*Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Coleman*,

501 U.S. at 735).  For a state procedural rule to be deemed an "adequate" basis for the state

court's decision, the rule must be "firmly established and regularly followed" by the state, *see*

*Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted),

and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*,

331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

---

[21] A petitioner may also exhaust a claim by raising it to the state trial court or the appropriate Appellate Division on a state petition for a writ of habeas corpus, *see* N.Y. C.P.L.R. § 7002, and by then appealing from the denial of that petition, *see* N.Y. C.P.L.R. § 7011; *see also Garcia v. Laclair*, No. 06cv10196 (SHS) (DF), 2011 WL 1097414, at *14 (S.D.N.Y. Jan. 3, 2011) (finding that habeas claim was unexhausted where petitioner had not appealed from the denial of a state habeas petition), *report and recommendation adopted,* No. 06cv10196 (SHS), 2011 WL 1046058 (Mar. 22, 2011).

To overcome the procedural bar to federal habeas review, the petitioner must show both "cause" for the procedural default and "prejudice" resulting therefrom. *See Coleman*, 501 U.S. at 749-50. "Cause" is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). More specifically, a petitioner can show "cause" for a procedural default when (1) "the factual or legal basis for a claim was not reasonably available," (2) "some interference by state officials made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett*, 41 F.3d at 829 (internal quotation marks and citation omitted). As for the "prejudice" prong, while the Supreme Court has not given "precise content" to the term "prejudice," *see Sykes*, 433 U.S. at 91, it has made clear that a petitioner must show more than "a *possibility* of prejudice;" rather, the legal errors raised in the petition must have "worked to [the petitioner's] *actual* and substantial disadvantage," *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). This is "a significantly higher hurdle than would exist on direct appeal," *id.* at 166, as the degree of prejudice must be sufficient "to overcome society's justified interests in the finality of criminal judgments," *id.* at 175.

A defaulted claim may also be reviewed in a federal habeas proceeding where a "fundamental miscarriage of justice" would result from the court's failure to review the claim; but, to satisfy this exception to the procedural bar, the petitioner must make a showing of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see also Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). "Actual innocence" means "factual innocence, not mere legal insufficiency." *Dunham*, 313 F.3d at 730 (citation omitted). To support an allegation of a fundamental miscarriage of justice, the petitioner must bring forward "new reliable evidence –

41

whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup*, 513 U.S. at 324.

Where a petitioner presents an unexhausted claim, but, under state procedural law, no longer has any available avenue to pursue the claim in the state courts (as when, for example, a claim is record-based, but the petitioner failed to raise it in his one opportunity for direct appeal), the claim should be deemed exhausted for purposes of federal habeas review.  *See Grey v. Hoke*, 933 F.2d 117, 120-21 (1991); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).  The state-law procedural bar that gives rise to the claim being deemed exhausted, however, "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim, unless [the] petitioner can demonstrate cause and prejudice for the default."  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (citations omitted); *see also, e.g.*, *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003) ("[W]e conclude that [the petitioner's] appellate counsel unjustifiably failed to argue this ineffective assistance claim on direct appeal despite a sufficient record . . . .  Accordingly, [the petitioner's] claim is procedurally defaulted for the purposes of federal habeas review as well.").

> ### D.   <u>Standard of Review</u>

When this Court reviews a federal constitutional claim that has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[22]

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409). To be entitled to habeas relief, a petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

---

[22] In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

## II.     THE PETITION SHOULD BE DISMISSED.

### A.     Timeliness of the Petition

As a preliminary matter, this Court notes that there is no issue as to whether Petitioner filed his habeas petition within the one-year statute of limitations provided by AEDPA.  On July 13, 2015, the New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's affirmance of his conviction and sentence, *see generally Bracey*, 25 N.Y.3d 1198, and, for purposes of the AEDPA statute of limitations, his conviction became final 90 days thereafter, *i.e.*, on October 11, 2015, when his time to petition for certiorari expired, *see Williams*, 237 F.3d at 150-51.  As noted above, Petitioner's undated habeas petition was received by the Court on October 7, 2016, within the one-year limitations period.

### B.     The Claims Raised in the Petition Are Without Merit.

Petitioner's habeas petition raises two claims: (1) that he received ineffective assistance of trial counsel in violation of the Sixth Amendment, and (2) that his post-arrest statement to the police should have been suppressed.  This Court will address each of these claims in turn.

#### 1.     Ground One:  Petitioner's Ineffective-Assistance-of-Counsel Claim

Petitioner's first stated ground for habeas relief is that he was denied the effective assistance of trial counsel in violation of the Sixth Amendment.  (*See* Pet. (attachment), at ECF 15.)  As Respondent implicitly concedes, Petitioner exhausted his ineffective-assistance-of-counsel claim by raising it in his Section 440.10 motion (*see* Pet. § 440.10 Mem., at SR 162-63), as well as in his brief to the Appellate Division (*see* Pet. App. Mem., at SR 423-24 (citing the Sixth Amendment and *Strickland*, 466 U.S. at 668)).  Although Petitioner primarily relied on

44

state-law precedent in his supplemental letter to the New York Court of Appeals (*see* Dkt. 16-18, at SR 581, 583-86 (relying on *Oliveras*, 21 N.Y.3d at 339)), his initial letter seeking leave to appeal indicated that he was relying on the briefs filed in the Appellate Division (*see id.*, at SR 574), and this was sufficient to exhaust the claim for purposes of federal habeas review, *see Galdamez v. Keane*, 394 F.3d at 68, 76 (2d Cir. 2005).  As the claim was exhausted, and as the last-reasoned decision of the state courts (the Appellate Division's decision) decided the claim on the merits, this Court must review the claim under the deferential standard of review set out in AEDPA.  *See* 28 U.S.C. § 2254(d).  Accordingly, this Court must determine whether, under AEDPA, the Appellate Division's decision was contrary to, or represented an unreasonable application of, clearly established federal law, or rested on an unreasonable determination of the facts, in light of the evidence that was before that court.  *See* 28 U.S.C. § 2254(d)(1), (2).

For AEDPA purposes, the "clearly established federal law" regarding a defendant's constitutional right to the effective assistance of counsel is outlined in *Strickland*.  *See* 466 U.S. at 687-88; *see also Richter*, 562 U.S. at 101 (habeas petitioner must establish that *Strickland* was applied unreasonably by state courts).  To prevail on an ineffective assistance claim under *Strickland*, a habeas petitioner must show that:  (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) he suffered prejudice as a result.  *Strickland,* 466 U.S. at 688, 694.  As to the first prong of this test, there is a strong presumption that counsel's conduct fell within the range of reasonably professional assistance.  *See id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.")  With regard to prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694; *see also Richter*, 562 U.S. at 111-12 (holding that, to satisfy this second prong, "[t]he likelihood of a different result must be substantial, not just conceivable"). A court may reject an ineffective-assistance-of-counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012) (rejecting ineffective-assistance-of-counsel claim based on the petitioner's failure to satisfy one of *Strickland*'s two prongs).

In light of the deference that must be accorded under *Strickland* and separately under AEDPA, this Court's review of an ineffective-assistance-of-counsel claim that a state court decided on the merits is "doubly deferential." *Woods v. Etherton,* 136 S. Ct. 1149, 1151 (2016) (citing *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)). In other words, under AEDPA, a petitioner "must do more than show that he would have satisfied *Strickland*'s test if his [ineffective-assistance] claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, [the petitioner] must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id*. at 699. "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. Thus, application of the AEDPA standard of review, coupled with the strong presumption that counsel "rendered adequate assistance and made all significant decision in exercise of reasonable

46

professional judgment" typically affords "both the state court and the defense attorney the benefit of the doubt." *Etherton*, 136 S. Ct. at 1151 (citations omitted).

In this case, the Appellate Division held that Petitioner had "not established that his trial counsel's alleged errors resulted in prejudice under the state or federal standards." *Bracey*, 997 N.Y.S.2d at 421 (citing, among others, *Strickland*, 466 U.S. at 668). This determination is entitled to deference, under AEDPA.

**a.**     **Petitioner Has Not Shown that His Trial Counsel's
Claimed Failures Were Objectively Unreasonable.**

As set out above, the first prong of the *Strickland* test requires a showing that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 687-88. The Supreme Court has instructed that, in preparing for trial, defense counsel is "entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. In general, the choice "whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). While "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, . . . [rare] are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Richter*, 562 U.S. at 106 (citing *Strickland*, 466 U.S. at 689). As such, there is no "*per se* rule requiring a defense counsel to consult with a medical expert in order to cast doubt on a key prosecution witness," *Bell,* 500 F.3d at 156, and the decision "'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" *United States v.*

47

*Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)).

In this case, Petitioner argues that his trial counsel, Jaffe, denied him effective assistance because Jaffe allegedly failed to investigate Merritt's mental health diagnosis, failed to consult or call an expert at trial, and failed to introduce Merritt's medical records into evidence.  (*See* Pet. (attachment), at ECF 15.)  As discussed below, with respect to each of these allegations, Petitioner has not made the showing necessary to satisfy the first prong of the *Strickland* test – that Jaffe's performance fell below an objective standard of reasonableness, "as measured under prevailing professional norms."  *Strickland*, 466 U.S. at 687-88.

### i.   Petitioner's Claim That His Trial Counsel Failed To Investigate Merritt's Mental Health Diagnosis

Petitioner claims that Jaffe "failed to investigate the paranoid schizophrenia diagnosis of [] Merritt, whose credibility was the sole issue at trial."  (Pet. (attachment), at ECF 15.)  In his brief to the Appellate Division, Petitioner took particular issue with the fact that Jaffe did not subpoena Merritt's medical records until near the start of trial.  (*See* Pet. App. Mem., at SR 424-25.)

In order to provide effective counsel, an attorney "has a duty to make reasonable investigations."  *Strickland*, 466 U.S. at 691.  An attorney, however, "need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  *Richter*, 562 U.S. at 108 (citing *Strickland*, 466 U.S. at 691).

As an initial matter, in its Section 440.10 decision, the trial court noted that Jaffe *did* investigate Merritt's mental health condition when he sought the court's signed subpoena for Merritt's medical records, albeit days before the trial began.  (*See* Section 440.10 Decision, at SR 294.)  To the extent that Petitioner suggests that no such inquiry even occurred, such a

contention is belied by the trial record in this case.  (*See* Pretrial Tr. (Dkt. 16-24), at 45-46, 49; *see also* Trial Tr. (Dkt. 16-27), at 149.)  Moreover, this Court perceives no error in the Appellate Division's determination that, "[r]egardless of whether counsel should have obtained the victim's medical records earlier," Petitioner had "not shown a reasonable possibility that such an impeachment of the victim would have been any more successful than the impeachment devices counsel did employ at trial."  *Bracey*, 997 N.Y.S.2d at 421-22.

As the trial court noted, "[i]t was clear that [Jaffe] reviewed [those] medical records and had the benefit of them before cross-examining Merritt."  (Section 440.10 Decision, at SR 294.)  Indeed, the trial transcript reveals that Jaffe was able to show repeatedly on cross-examination that Merritt was non-compliant with his psychotropic medications; in particular, even before the subpoenaed medical records were delivered to the court, Merritt admitted on cross-examination that he did not always take his medication, although he knew he was required to do so, and that he did not take his medication on the day of the robbery or before testifying at trial.  (*See* Trial Tr. (Dkt. 16-29), at 171-75.)  After Jaffe reviewed the subpoenaed records, he used them further during cross-examination to elicit several other admissions from Merritt, including that he had not taken his medication on a daily basis in November 2007 – the month of the robbery.  (*Id.*, at 205-07.)  Accordingly, the Appellate Division's rejection of Petitioner's assertion that Jaffe's impeachment of Merritt would have been any more successful had the medical records been received earlier cannot be found to have been either contrary to, or an unreasonable application of, *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).

ii. **Petitioner's Claim That His Trial Counsel
Failed To Consult With a Medical Expert
or Introduce Expert Testimony at Trial**

Next, Petitioner claims that Jaffe had no strategic basis for failing to consult with a

medical expert or to call such an expert to testify at trial. (*See* Pet. (attachment), at ECF 15-17.)

In particular, according to Petitioner, had "Dr. Schneider [been] called to testify at the trial," the

"jury could have concluded . . . that [P]etitioner may have been present at the scene for the sole

reasons he claimed in [his] police statement, 'to get the money owed to him.'" (*Id.*, at ECF 17.)

As to this claim, the Appellate Division concluded that, "regardless of whether counsel

should have consulted an expert," Petitioner "ha[d] not shown a reasonable possibility that such

an impeachment of [Merritt] would have been any more successful than the impeachment

devices counsel did employ at trial." *Bracey*, 997 N.Y.S.2d at 421-22.  Again, this Court finds

no error in the Appellate Division's reasoning, as there is no "*per se* rule requiring a defense

counsel to consult with a medical expert in order to cast doubt on a key prosecution witness,"

*Bell*, 500 F.3d at 157, and as the trial record in this case reveals that Jaffe conducted a skillful

cross-examination, during which he elicited that Merritt had a long psychiatric history, had an

expansive criminal history, was on certain psychotropic medications, had been non-compliant

with those medications at the time of the robbery and the trial, and had sent letters to the District

Attorney's Office concerning various conspiracies at the Hotel soon after the incident. (*See* Trial

Tr. (Dkt. 16-31), at 665-66, 672-73.)

Even though the trial court had ruled that, without a testifying medical expert, the defense

could not introduce Merritt's specific diagnosis or the names for his various medications, it

would still be reasonable to conclude that a competent defense attorney might have elected not to

call an expert to testify about the diagnosis and the records.  Those reasons may have included

the fact that calling an expert could have opened the door for the prosecution to call an expert rebuttal witness or a fact rebuttal witness, such as Merritt's treating physician, *see Richter*, 562 U.S. at 111 (noting that, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation"), or the fact that Jaffe could have reasonably believed that cross-examining Merritt about his psychiatric condition would be as effective as introducing expert testimony.  As to this latter point, the trial court specifically found that, because "the jury already knew that Merritt had a psychiatric condition and was at times non-compliant with his medicines," the inclusion of an expert's opinion was arguably "of no moment," as it "would have established essentially the same facts" already established through cross-examination at trial. (Section 440.10 Decision, at SR 297-98.)

Moreover, Merritt's ability to *identify* Petitioner was not at issue in this case, due to Jaffe's successful pretrial suppression motion.  (*See* Supp. Ruling Tr., at 22-23.)  Thus, under the circumstances, where Merritt's "account of the crime was extensively corroborated" by his neighbor's contemporaneous 911 call and by police officers' "observations of [Petitioner's] incriminating behavior when he was found dropping a loaded firearm," it was not unreasonable for the Appellate Division to have concluded that "the absence of additional psychiatric evidence did not deprive [Petitioner] of a fair trial or undermine confidence in the result."  *Bracey*, 997 N.Y.S.2d at 422.  Accordingly, this Court finds that the Appellate Division's determination as to this claim is entitled to deference under AEDPA, as a reasonable application of established federal law.

### iii.   Petitioner's Claim That His Trial Counsel Failed To Introduce Merritt's Medical Records at Trial

Lastly, Petitioner argues that, because Merritt was the sole witness to the robbery, Jaffe's failure to present Merritt's medical records to the jury amounted to ineffective assistance of counsel.  (*See* Pet. (attachment), at ECF 16.)

With respect to this claim, the Appellate Division concluded, "[t]here is no indication that psychiatric records and testimony would have supported a conclusion that [Merritt's] account of the incident was the product of mental illness, or would have supported [Petitioner's] defense." *Bracey*, 997 N.Y.S.2d at 422.  Given the "heavy measure of deference to counsel's judgments" afforded by *Strickland*, Jaffe's decision not to introduce Merritt's medical records could have again been strategic.  *See Strickland*, 466 U.S. at 691.  As the trial court explained in its Section 440.10 decision, "an experienced attorney such as counsel could have legitimately concluded that, as a tactical matter, it was best not to introduce the records."  (Section 440.10 Decision, at SR 299.)  As detailed above, some of the subpoenaed medical records in fact contained information that would have been helpful to the prosecution.  (*See* Dkt. 16-10, at SR 200.)  One medical record from January 2008, for example, describes how Merritt reported to a case worker that he was "robbed at gun point," thereby corroborating his testimony.  (*Id.*)  As another example, a record from November 15, 2007 indicates that Merritt was not experiencing delusions around the time of the robbery.  (*See* Dkt. 16-9, at SR 92.)  Faced with these records and the fact that Merritt's ability to identify Petitioner was not at issue at trial, the Appellate Division's rejection of Petitioner's claim regarding Jaffe's failure to introduce the medical records cannot be found to have been either contrary to, or an unreasonable application of, *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).

Accordingly, for each of his allegations, Petitioner has not made the showing necessary to satisfy the first prong of *Strickland* – that his counsel's performance fell below an objective standard of reasonableness, "as measured under prevailing professional norms," *Strickland*, 466 U.S. at 688, and his ineffective-assistance-of-counsel claim should thus be denied on the merits.

b. <u>**Petitioner Has Not Demonstrated Prejudice.**</u>

In any event, Petitioner's ineffective-assistance-of counsel claim fails for the independent reason that he has not shown that Jaffe's alleged errors, even if unreasonable, would have affected the outcome of the trial, as separately required to show a constitutional violation. *Strickland,* 466 U.S. at 694.  When asserting that an alleged failure by counsel caused the requisite prejudice, a petitioner cannot rely on vague or speculative allegations.  *Carter v. McKoy*, No. 09cv1030 (NRB), 2010 WL 3290989, at *7 (S.D.N.Y. Aug. 9, 2010) ("[v]ague and conclusory allegations are not sufficient to demonstrate either that counsel was ineffective or that the petitioner suffered actual prejudice"); *see Kemp v. New York*, No. 07cv6996 (RMB) (HBP), 2009 WL 306258, at *14 (S.D.N.Y. Feb. 9, 2009).  In other words, "some objective evidence other than [the petitioner's] assertions [is required] to establish prejudice."  *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).

Additionally, when a claim of ineffective assistance is based on a failure to call a certain witness, Petitioner must do more than show that the witness would have given testimony that may have assisted his case; he must demonstrate that the witness would have given testimony that actually would have tended to exonerate him.  *United States v. Vargas*, 920 F.2d 167, 170 (2d Cir. 1990) (affirming dismissal of ineffective-assistance-of-counsel claim where "the proffered testimony of the other suggested defense witnesses relate[d] only to collateral matters"); *Erbo v. United States*, No. 08cv2881 HB, 2009 WL 2460998, at *4 (S.D.N.Y.

Aug. 12, 2009) (dismissing ineffective-assistance-of-counsel claim where petitioner "d[id] not identify any specific testimony . . . that would have exonerated him"); *see also Grant v. Ricks*, 151 F. App'x 44, 46 (2d Cir. 2005) (summary order) (affirming dismissal of ineffective-assistance-of-counsel claim where petitioner failed to show prejudice, as additional witnesses "[were] of limited usefulness" in exculpating petitioner).

As is evident from the trial transcript, Petitioner's principal defense at trial was that Merritt was a noncredible and nonreliable witness who fabricated Petitioner's involvement in the robbery. (*See generally* Trial Tr. (16-31), at 665-66, 672-73.) Petitioner's habeas petition fails to show a reasonable probability that calling an expert such as Dr. Schneider to testify or introducing Merritt's redacted medical records into evidence would have resulted in the jury's complete adoption of that defense. (*See generally* Pet. Mem.; Pet. Reply.) Specifically, nothing in a medical expert's potential testimony or in Merritt's redacted records would have directly refuted the significant corroborating evidence in this case, including the 911 call, the testimony of the police officers who arrived at the scene, or even Petitioner's own post-arrest statement wherein he admitted to being in the Hotel at the time of the incident, speaking with Merritt in his apartment, and being in possession of a gun at the time of his arrest. (*See* Dkt. 16-1, at SR 17.)

In short, even if, as Petitioner argues, the inclusion of expert testimony or the admission of the redacted medical records would have bolstered his argument that Merritt was not a credible witness, Petitioner has not shown a substantial likelihood that, with the benefit of such evidence, the jury would have concluded that Merritt had entirely fabricated Petitioner's participation in the robbery. Petitioner has therefore failed to show a reasonable probability that the introduction of expert testimony or the medical records would have altered the outcome of the trial. Thus, the Appellate Division correctly held that "the absence of additional psychiatric

evidence did not deprive [Petitioner] of a fair trial or undermine confidence in the result." *Bracey*, 997 N.Y.S.2d at 422.

In conclusion, Petitioner faces a "high bar" in his claim for federal habeas relief based on his trial counsel's allegedly defective performance. *United States v. Martinez*, 953 F. Supp. 2d 514, 518 (S.D.N.Y. 2013). Petitioner's allegations regarding Jaffe's performance at trial fail to meet that bar and fall short of "undermin[ing] confidence in the outcome of the trial." *Barnes v. United States*, No. 13cv9105 (LAP), 2015 WL 5854030, at *10 (S.D.N.Y. Aug. 31, 2015) (citation omitted). As Petitioner has not shown that Jaffe's performance was objectively unreasonable, and also has not shown that Jaffe's alleged failures likely affected the outcome of the trial, Petitioner's ineffective-assistance-of-counsel claim should be denied in its entirety on the merits, under AEDPA.

### 2.  Ground Two:  Petitioner's Claim That His Post-*Miranda* Statement Should Have Been Suppressed

As his second habeas claim, Petitioner contends that the statement he gave to the police after he received *Miranda* warnings should have been suppressed because it was the product of an unlawful interrogation that violated his Fifth Amendment rights. Specifically, Petitioner asserts that, in violation of the principles set out in *Missouri v. Seibert*, 542 U.S. 600 (2004), he was subjected to "a deliberate two-stage interrogation," by which the police sought to elicit a confession prior to giving *Miranda* warnings and then provided the *Miranda* warnings only after he had already made inculpatory statements, without taking any "curative steps" to address the initial impermissible questioning. (*See* Pet. (attachment), at ECF 17.)

In opposition, Respondent contends that, even though Petitioner raised a claim on direct appeal that invoked the Fifth Amendment and *Miranda*, his argument to the state courts, reasonably read, was not focused on *Seibert,* but rather on a somewhat different and broader

doctrine adopted by the New York State courts, as to which there is "no federal analog."  (Resp. Mem., at 43-44 (citing *Jenkins v. Lee*, No. 11cv6806 (PAE) (DF), 2014 WL 5861987 (S.D.N.Y. Nov. 12, 2014), at *19 (adopting and annexing copy of report and recommendation dated Aug. 11, 2014)).)

In reply, Petitioner argues that he "reasonably informed the state court about his federal claim and thus provided the court with a fair presentation of the federal claim that the police deliberately followed their department procedure, which is a two-step process of interrogation of a suspect, and outlawed in [*Seibert*]."  (Pet. Traverse ¶ 3; *see also id.* ¶ 4 (stating that, "when [P]etitioner filed his direct appeal . . ., he mentioned the [s]ame relevant facts and legal theory that is now in his [P]etition before this Court").)

Having reviewed both Petitioner's submissions to this Court and his submissions to the state courts, this Court finds that Petitioner's arguments to the state courts regarding his post-*Miranda* statement were primarily based on state law, and, to the extent he is trying to raise the same state-law claim here, it is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (state-law claims not cognizable in federal habeas proceeding).

This Court also finds, however, that, even if Petitioner did not fully articulate a claim under *Seibert* on his direct appeal – or if such a claim was not his primary focus – he did, nonetheless, explicitly claim a Fifth Amendment violation (*i.e.*, a federal constitutional violation) based on the way in which his interrogation was conducted – where a portion of the questioning was conducted pre-*Miranda* warnings and another portion was conducted post.  (*See* Pet. App. Mem., at SR 446.)  Further, Petitioner actually cited *Seibert* in his opening brief to the Appellate Division (*id.*, at SR 452), and the principal state-court case on which he relied, *People v. Paulman*, 5 N.Y.3d 122 (2005) (*see id.*, at SR 448-52), itself contained a discussion of *Seibert*,

*see Paulman*, 5 N.Y.3d at 133.  Moreover, Petitioner's initial letter to the Court of Appeals seeking leave to appeal, indicated that he was relying on his briefs to the Appellate Division (Dkt. 16-18, at SR 574), even though his supplemental letter again focused on the state-law aspect of his claim (*see id.*, at SR 581-83).  Taken as a whole, this Court finds that Petitioner's state-court submissions were sufficient to satisfy the exhaustion requirement for his federal habeas claim, but, for the reasons discussed below, this Court further finds that the claim is meritless.

> ### a.  <u>The Fifth Amendment Privilege Against Self-Incrimination</u>

To safeguard the Fifth Amendment privilege against self-incrimination, the Supreme Court has held that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation."  *Miranda*, 384 U.S. at 471.  That individual must be advised that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Id.* at 479.  "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  *Id.* at 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490 n.14 (1964)).

Generally, under federal law, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  *Elstad v. Oregon*, 470 U.S. 298, 318 (1985).  "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of

any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309.  A subsequent warned statement must be suppressed, however, where law enforcement employs a "deliberate two-step strategy" – that is, where *Miranda* warnings are withheld until the suspect substantially confesses, and then are given prior to re-eliciting the same confession.  *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment); *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (describing *Seibert* as "an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession").  Under federal law, the following facts are relevant to determining whether the *Miranda* warnings given to a suspect have been eviscerated due to such a deliberate two-step strategy:  "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615.

### b.      The State-Law Claim Petitioner Raised on Direct Appeal

As referenced above (*see* Background, *supra*, at Section (B)(6)), Petitioner argued on direct appeal that his post-*Miranda* statement should have been suppressed because he was subjected to a "continuous chain of questioning" by the police – starting before the *Miranda* warnings were given and continuing thereafter – that did not adequately safeguard his Fifth Amendment Rights.  (*See* Pet. App. Mem., at SR 447 (quoting *Chapple*, 38 N.Y.2d at 115).) This argument appears to have been based on state constitutional law, as articulated by the New York Court of Appeals.

In *Chapple*, the New York Court of Appeals held that, for *Miranda* warnings to be effective, they had to "[p]recede the subjection of a defendant to questioning." *Chapple*, 38 N.Y.2d at 115. "Later is too late," the court reasoned, "unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning." *Id*. In *Elstad*, however, the Supreme Court made clear that, under federal law, there is no automatic suppression requirement where a warned statement followed an unwarned one, without a meaningful break in the interrogation. Rather, the question of whether such a "break" (or other changes in the circumstances of the interrogation) occurred is only relevant if the first statement was actually coerced. *See Elstad*, 470 U.S. at 313-14.

After *Elstad*, the New York Court of Appeals considered whether *Chapple* remained viable and concluded that it did – under *state* law. Specifically, in *People v. Bethea*, 67 N.Y.2d 364 (1986), the court held:

> We conclude that the mandate of NY Constitution, article I, § 6 that '[n]o person . . . shall . . . be compelled in any criminal case to be a witness against himself' would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given. The rule of the *Chapple* case, therefore, continues as a matter of State constitutional law, to govern the admissibility of statements obtained as a result of continuous custodial interrogation.

*Id*. at 365; *see Parsad v. Greiner*, 337 F.3d 175, 181 n.2 (2d Cir. 2003) (noting that "New York courts do not recognize the holding of [*Elstad*] that *Miranda* warnings remove the taint of coercion"); *accord Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998).

The case on which Petitioner particularly relied in his briefing on direct appeal, *Paulman*, followed in the line of *Chapple* and *Bethea*, and set out a number of factors that the state court

found to be relevant to determine whether a police interrogation that initially preceded *Miranda* warnings, but then proceeded after the warnings were given, should be considered a "continuous" interrogation that was violative of the state constitution.  *Paulman*, 5 N.Y.3d at 101-02.  On his direct appeal, Petitioner principally argued that the trial court had failed to consider and correctly apply those "*Paulman* factors."  (Pet. App. Mem., at SR 448-52.)  Fairly read, this was an argument grounded in state law, and, thus, cannot be considered in this federal habeas proceeding.  *See* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties *of the United States*." (emphasis added)).

Accordingly, to the extent that Petitioner is attempting, in this Court, to challenge the Appellate Division's application of *Paulman*, his claim must be dismissed as non-cognizable.

### c.      Petitioner's Federal Claim Based on *Seibert*

Although the main thrust of Petitioner's claim in the state courts regarding the legitimacy of his post-*Miranda* interrogation was based on *Chapple* and *Paulman*, he also argued to the Appellate Division that his "pre- and post-Miranda questioning . . . was so closely tied to time, pace, and subject matter that it constituted a 'coordinated and continuing interrogation,'" in violation of the federal constitutional principles articulated by the Supreme Court in *Seibert*. (Pet. App. Mem., at SR 452.)  As this Court finds that Petitioner adequately exhausted this federal claim, this Court must review the Appellate Division's decision (the last reasoned decision of the state courts) under AEDPA's deferential standard of review.  Under that standard, Petitioner cannot prevail on this claim.

Unlike the state law cited by Petitioner on his appeal, *Seibert* stands for a narrow principle – it prohibits police interrogators from intentionally withholding *Miranda* warnings as a tactic to aid in obtaining an incriminating statement, and then re-eliciting the same statement after giving the warnings.  *See Carter*, 489 F.3d at 536 (holding that "*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the post[-]warning confession"); *see also Seibert*, 542 U.S. at 622.  When the police do not use this "deliberate, two step" tactic to extract a post-warning confession, "the holding in *Elstad* applies."  *Carter*, 489 F.3d at 536.

In this case, Petitioner suggests that the Appellate Division should have held *Seibert* to have been violated because, in Petitioner's view, the warnings he was given "could not 'function effectively as *Miranda* requires' because [he] was 'misle[d] and depriv[ed] . . . of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."  (Pet. Reply Mem., at 7 (quoting *Seibert*, 542 U.S. at 613-14).)  More specifically, Petitioner argues that, in questioning him after his arrest, Sergeant Salomons deliberately conducted a "two-part interview" (which, Petitioner claims was "Police Department procedure") (Pet. (attachment), at ECF 18; *see also* Pet. Traverse ¶ 8 (stating that "the record showed that [Sergeant] Salomons followed the Police Department procedure that he was told to conduct as a two-part interview")), in which Sergeant Salomons waited to administer *Miranda* warnings until after first eliciting an incriminating statement – *i.e.*, that drugs could be purchased at the Hotel (*see* Pet. (attachment), at ECF 19).

Sergeant Salomons' post-arrest interview of Petitioner presents a set of facts that is plainly distinguishable from those presented in *Seibert*, where the police intentionally elicited from the defendant a full and detailed confession prior to giving her *Miranda* warnings, and then,

after nominally warning her, walked her through the same confession, prompting her with references to her unwarned statements.  *See Seibert*, 542 U.S. at 604-06.  Here, in contrast, Sergeant Salomons' pre-*Miranda* interview of Petitioner consisted of only three questions, which he expressly characterized as "totally unrelated to [the] case."  (Supp. Hrg. Tr. (Dkt. 16-22), at 405.)  Sergeant Salomons then told Petitioner when the "first part" of the interview was over, and explained that, before he could ask specific questions about "what happened to [Petitioner]" at the Hotel, he needed to read him his *Miranda* rights.  (*Id.*)

Further, nothing about Petitioner's responses to these initial pre-*Miranda* questions mirrored or appear to have led directly to his post-*Miranda* statement.  To the contrary, Petitioner's responses to the initial pre-*Miranda* questions did not incriminate him in either the robbery or gun charges at issue.  (*See id.*)  Indeed, during the pre-*Miranda* questioning, Petitioner denied any involvement with guns and otherwise claimed that he did not know anything about "criminal activity" in New York City.  (*Id.*, at 406.)  Thus, "unlike in *Seibert*, there is no concern here that police gave [Petitioner] *Miranda* warnings and then led him to repeat an earlier [] confession, *because there was no earlier confession to repeat*."  *Bobby v. Dixon*, 565 U.S. 23, 31 (2011) (emphasis added).

As no "deliberate, two-step" interrogation as described by the Supreme Court in *Seibert* occurred here (*see Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment)), the holding in *Elstad* applies.  Reviewing the totality of the interactions between Sergeant Salomons and Petitioner, this Court finds, under *Elstad*, that the pre-*Miranda* questioning did not adversely affect Petitioner's ability to understand and voluntarily waive the *Miranda* rights of which he was fully advised before he made his statement regarding the specific events at the Hotel.  *See Elstad*, 470 U.S. at 309-10.  Notably, Petitioner's post-*Miranda* statement was largely

exculpatory, as he denied participating in the robbery, denied knowing McDaniel, and claimed that the gun he had "found" on the hallway floor was not his.  (*See* Statement, at SR 17.)  These exculpatory remarks to the police underscore the conclusion that Petitioner's post-*Miranda* statement was "knowingly and voluntarily," and thus admissible under *Elstad*.  *See Elstad*, 470 U.S. at 309.  Petitioner has thus shown no error, under federal law, in the Appellate Division's decision that his "post-*Miranda* statements were admissible."  *Bracey*, 997 N.Y.S.2d at 422.

Petitioner therefore cannot meet AEDPA's high burden.  He has made no argument that the Appellate Division's decision regarding the admissibility of his post-*Miranda* statement was based on an "unreasonable determination of the facts in light of the evidence presented" during the state court proceedings, *see* 28 U.S.C. § 2254(d)(2), and, indeed, the facts on which the court relied regarding the substance of Petitioner's interrogation by Sergeant Salomons, are not in dispute.  Further, given that those underlying facts are markedly different than those that were presented in *Seibert*, Petitioner has not shown that the Appellate Division's decision was "contrary to" clearly established Supreme Court law, as articulated in that case.  *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06.  Finally, in light of the fact that Petitioner – as discussed above – has not even shown that the Appellate Division committed any federal constitutional error in its ruling regarding the admissibility of his post-*Miranda* statement, he certainly has not established that the court's decision involved an "unreasonable application" of federal law, as established by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1); *Wiggins*, 539 U.S. at 409; *Lockyer*, 538 U.S. at 76.

Accordingly, I recommend that the Court deny Petitioner's second habeas claim.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Petitioner's Petition for a Writ of Habeas Corpus be dismissed in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, United States Courthouse, 40 Centre Street, Room 415, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Broderick.  ABSENT AN EXTENSION, THE FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  (*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 98, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).)

If Petitioner does not have access to the cases cited herein that are reported only on Westlaw, he may request copies from Respondent's counsel.  *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the pro se litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

The Clerk of Court is directed to mail a copy of this Report and Recommendation to

Petitioner, at both of the two addresses provided below.

Dated:  New York, New York
        April 27, 2020

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Darren Bracey
10-A-1642
Auburn Correctional Facility
P.O. Box 618
Auburn, NY  13024

    -and-

Mr. Darren Bracey
10-A-1642
Coxsackie Correctional Facility
11260 Route 9W
P.O. Box 999
Coxsackie, NY  12051-0999

Respondent's counsel (via ECF)